IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **LAURA MEDRANO and MICHAEL MCQUEARY, on Behalf of Themselves and on Behalf of All Others Similarly Situated,** | § § § § § | |
| **Plaintiffs,** | § § | NO. CIV. A. 1:20-CV-1245-MHS |
| **V.** | § § | |
| **THE UNITED STATES OF AMERICA,** | § § | |
| **Defendant.** | § § | |

## PLAINTIFFS' FIRST AMENDED COLLECTIVE ACTION AND CLASS ACTION COMPLAINT

1.     This lawsuit is brought by the Named Plaintiffs Laura Medrano and Michael McQueary, on behalf of themselves and all others similarly situated, ("Plaintiffs") against the Defendant United States of America ("Defendant").[1]

2.     The Plaintiffs and proposed Class Members are current and former employees of the United States Government employed at the U.S. Department of Justice, Bureau of Prisons.  The Plaintiffs and Class Members worked across the country and were systemically denied the pay that they were entitled under the Fair Labor Standards Act and the Federal Employees Pay Act.  This case challenges Defendant's long standing policy of failing to properly compensate its non-exempt correctional officers for all hours that they work. Specifically, Defendant only paid the Plaintiffs and the Class Members for the time they were scheduled to work instead of the time they *actually* performed work for Defendant.

---

[1] In addition to the Named Plaintiffs, 15 other individuals have joined this case as Opt-In Plaintiffs pursuant to 28 U.S.C. § 216(b).  The 15 Opt-In Plaintiffs are Lucas Meyer, Ryan Howell, Marlen Rodriguez, Marquis Mosely, Geoffrey McCreary, Demarcus Taylor, Deon Scott, Juan Flores, Jerry Motley, Eva Garciatadeo, Jarred Chandler, Christopher Palomares, Jasara Acosta, John Sida, and Jason McDonald.

3.      Although Plaintiffs and the Class Members often worked in excess of eight hours in one day and 40 hours per week, they were not paid all earned overtime wages as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. Plaintiffs bring this claim as a collective action pursuant section 216(b) of the FLSA.

4.      Plaintiffs also bring a class action claim under Rule 23 of the Federal Rules of Civil Procedure for Defendant's failure to pay Plaintiffs and the Class Members all earned night shift premiums in violation of the Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5545.

## SUBJECT MATTER JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiff's claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). *Abbey v U.S.*, 745 F.3d 1363, 1369 (Fed. Cir. 2014).

6.      Venue is proper in this judicial district. *Id.*

## PARTIES AND PERSONAL JURISDICTION

7.      Plaintiff Laura Medrano is an individual residing in Adelanto, California.  Plaintiff has worked for Defendant as a correctional officer at the <u>Federal Correctional Institution in Victorville, California</u>.  Plaintiff Medrano has been employed by Defendant since 2016. Her written consent to this action was previously filed with the court.

8.      Plaintiff Michael McQueary is an individual residing in Victorville, California. Plaintiff has worked for Defendant as a correctional officer at the <u>Federal Correctional Institution in Victorville, California</u>.  Plaintiff McQueary has been employed by Defendant since 2000. His written consent to this action was previously filed with the court.

9.      Opt-In Plaintiff Demarcus Taylor is an individual residing in Douglasville, Georgia.  Plaintiff worked for Defendant as a correctional officer at the <u>Federal Correctional</u>

Institution in Yazoo City Low, Mississippi.  Said Plaintiff was employed by Defendant from February 2020 to June 2020. His written consent to this action was previously filed with the court.

10.     Opt-In Plaintiff Deon Scott is an individual residing in Memphis, Tennessee. Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institution in Memphis, Tennessee.  Said Plaintiff was employed by Defendant from May 2016 to May 2018. His written consent to this action was previously filed with the court.

11.     Opt-In Plaintiff Marlen Rodriguez is an individual residing in Wildwood, Florida. Plaintiff has worked for Defendant as a correctional officer at the Federal Correctional Complex, Coleman in Florida.  Said Plaintiff has been employed by Defendant since 2019. Her written consent to this action was previously filed with the court.

12.     Opt-In Plaintiff Christopher Palomares is an individual residing in Clermont, Florida.  Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Complex, Coleman in Florida.  Said Plaintiff was employed by Defendant from March 2008 to September 2018. His written consent to this action was previously filed with the court.

13.     Opt-In Plaintiff Jerry Motley, Jr. is an individual residing in Prattville, Alabama. Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institution in Oakdale, Louisiana and the Federal Prison Camp in Montgomery, Alabama.  Said Plaintiff has been employed by Defendant since December 2013. His written consent to this action was previously filed with the court.

14.     Opt-In Plaintiff Marquis Mosley is an individual residing in Huntsville, Alabama. Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institution in Aliceville, Alabama.  Said Plaintiff was employed by Defendant from June 2016 to May 2018. His written consent to this action was previously filed with the court.

15.     Opt-In Plaintiff Lucas Meyer is an individual residing in Bailey, Colorado.  Plaintiff worked for Defendant as a correctional officer at the <u>Federal Correctional Institution, Englewood in Colorado</u>.  Said Plaintiff was employed by Defendant from September 2016 to July 2020. His written consent to this action was previously filed with the court.

16.     Opt-In Plaintiff Jason McDonald is an individual residing in Edmond, Oklahoma.  Plaintiff worked for Defendant as a correctional officer at the <u>Federal Transfer Center in Oklahoma City, Oklahoma</u>.  Said Plaintiff was employed by Defendant from July 2014 to April 2020. His written consent to this action was previously filed with the court.

17.     Opt-In Plaintiff Geoffrey McCreary is an individual residing in Washington, Pennsylvania.  Plaintiff worked for Defendant as a correctional officer at the <u>Federal Correctional Institution, Hazelton in West Virginia</u> and the Federal <u>Correctional Institution in Cumberland, Maryland</u>.  Said Plaintiff was employed by Defendant from February 2014 to August 2019. His written consent to this action was previously filed with the court.

18.     Opt-In Plaintiff Ryan Howell is an individual residing in Ocala, Florida.  Plaintiff has worked for Defendant as a correctional officer at the <u>Federal Correctional Institution, Hazelton in West Virginia</u> and at the <u>Federal Correctional Complex, Coleman in Florida</u>.  Said Plaintiff has been employed by Defendant since December 2013. His written consent to this action was previously filed with the court.

19.     Opt-In Plaintiff Eva Garciatadeo is an individual residing in Los Angeles, California.  Plaintiff worked for Defendant as a correctional officer at the <u>United States Penitentiary in Atwater, California</u>.  Said Plaintiff was employed by Defendant from June 2018 to June 2019. Her written consent to this action was previously filed with the court.

20.    Opt-In Plaintiff Matthew Danzey is an individual residing in Milford, Pennsylvania.  Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institution in Otisville, New York and the Metropolitan Correctional Center in Manhattan, New York.  Said Plaintiff has been employed by Defendant since 2009. His written consent to this action was previously filed with the court.

21.    Opt-In Plaintiff John Sida is an individual residing in San Antonio, Texas.  Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institute in Three Rivers, Texas.  Said Plaintiff was employed by Defendant from August 2018 to January 2020. His written consent to this action was previously filed with the court.

22.    Opt-In Plaintiff Jasara Acosta is an individual residing in Conway, South Carolina.  Plaintiff worked for Defendant as a correctional officer at the Federal Correctional Institute in Fairton, New Jersey.  Said Plaintiff was employed by Defendant from August 2014 to September 2018. His written consent to this action was previously filed with the court.

23.    Opt-In Plaintiff Jarred Chandler is an individual residing in Valrico, Florida.  Plaintiff worked for Defendant as a correctional officer at the United States Penitentiary, Coleman in Wildwood, Florida.  Said Plaintiff was employed by Defendant from November 2012 to January 2018. His written consent to this action was previously filed with the court.

24.    Opt-In Plaintiff Juan Flores is an individual residing in Victorville, California.  Plaintiff has worked for Defendant as a correctional officer at the Federal Correctional Institute in Victorville, California.  Said Plaintiff has been employed by Defendant since March 2013. His written consent to this action was previously filed with the court.

25.    The FLSA Class Members are all current and former correctional officers who worked for Defendant at any time during the three year period prior to the filing of this Complaint

to the present.  Excluded from the class are any correctional officers who worked for Defendant at the United States Penitentiary Lee near Pennington Gap, Virginia, the Federal Correctional Institution Sheridan, or the Federal Detention Center in Sheridan, Oregon.

26.     The Rule 23 Class Members are all current and former correctional officers who worked for Defendant at any time during the six year period prior to the filing of this Complaint to the present.

27.     The FLSA Class Members and the Rule 23 Class Members shall be collectively referred to as the "Class Members."

## COVERAGE

28.     At all material times, Defendant has been an employer within the meaning of 3(d) of the FLSA. 29 U.S.C. § 203(d).

29.     As a public agency, Defendant is an enterprise engaged in commerce or in the production of goods for commerce as defined by 29 U.S.C. § 203(s)(1)(c).

30.     At all material times, Plaintiffs and the Class Members were/are employees engaged in commerce or the production of goods for commerce as required by 29 U.S.C. § 207.

31.     At all material times, Plaintiff and the Class Members were not exempt from overtime under the FLSA.

## FACTS

32.     The Plaintiffs and Class Members are/were non-exempt correctional officers employed by the United States Bureau of Prisons.  They have been entitled to the rights and protections of the FLSA and FEPA, including overtime pay and night shift pay. Unfortunately, Defendant has systematically violated the law by instituting a policy of only paying Plaintiffs and the Class Members for their scheduled shift time while requiring the Plaintiffs and Class Members

6

to perform work both before the start of their scheduled shifts and after the end of their scheduled shifts without pay.  This policy is illegal on its face.  Attached hereto as Exhibit "1" are examples of pay records showing Defendant's illegal pay policy.[2]  Again, Defendant does not pay for the actual time worked by the Plaintiffs and Class Members.

## BACKGROUND REGARDING PRISON FACILITIES

33.     The U.S. government operates prison facilities across the country.  These facilities house tens of thousands of criminals charged with or convicted of federal crimes, including violent crimes such as murder and rape.  To ensure the security of these prison facilities and to maintain the safety of these prison facilities, correctional officers are employed by the government.  These prison facilities, including the location where the Named Plaintiffs worked, are staffed by correctional officers 24 hours per day and 365 days per week.  The correctional officers ensure the safety and security of the prison facilities.  The correctional officers are required to maintain constant vigilance and monitor the actions of others as soon as they arrive at the facility.  If anything transpires that could affect the safety and security of the facilities, the correctional officers have a duty to act and address those issues no matter the location and time of day that it occurs, including before their paid shifts begin and after they end.

34.     Most of the posts at the prison facilities are staffed for either 16 hours or 24 hours per day, although some may be staffed for only 8 hours per day.  When a post is a 16 or 24 hour post, Defendant assigns a correctional officer to the post for a scheduled 8 hour shift.  As noted above, because the scheduled shift is for 8 hours, Defendant only pays for 8 hours even if the correctional officer performs work lasting longer than 8 hours.

---

[2] The time paid for by Defendant does not include any 10 minute, 15 minute, 20 minute, or even 30 minute increments.  Instead, pay is precisely in one hour increments (and not one minute over).

7

35.     For a 24 hour post, there are three 8 hour shifts.  For the 16 hour post, there are two 8 hour shifts.  Again, because each shift is a scheduled 8 hours, the correctional officers are only paid for 8 hours even if they work longer than 8 hours.

36.     There is no schedule overlap for these 8 hour shifts.  That is, as soon as one shift is scheduled to end, another shift is scheduled to begin.  The shifts are normally the Day Shift of 6 am to 2 pm, the Evening Shift of 2 pm to 10 pm, and the Morning Shift from 10 pm to 6 am.[3]  The correctional officers, including the Plaintiffs and Class Members, were required to be at their assigned posts, in uniform, with all assigned equipment, and ready to work by the start of their shift.  If they failed to do so and were late, they were subject to being disciplined.

37.     The Named Plaintiff Medrano regularly worked the Day Shift of 6 am to 2 pm during her employment, although she also worked other times as well.  The Named Plaintiff McQueary worked the Evening Shift and the Day Shift.  There were other times when he worked as well.

**THE PLAINTIFFS AND CLASS MEMBERS PERFORMED SIGNIFICANT PRE-SHIFT WORK THAT WENT UNCOMPENSATED**

38.     Defendant has failed to pay, pursuant to a common policy of only paying for scheduled time rather than actual time worked, all overtime compensation due to the Plaintiff and Class Members for time that Defendant has suffered or permitted them to work in pre-shift activities which were required to be performed on the premises of Defendant.  The Plaintiffs and Class Members were required to perform significant pre-shift work that was integral and indispensable to their daily duties for Defendant.

---

[3] Prior to June 2019, the Day Shift was 8 am to 4pm, the Evening Shift was 4pm to 12 am, and the Morning Shift was 12 am to 8 am.

39.     The primary job duty of the Plaintiffs and the Class Members was to manage and oversee the inmate population at the prison centers, to ensure safety at the prisons, and to maintain security at the prisons. The Plaintiffs and Class Members were responsible for the custody and discipline of inmates and detainees held at correctional and detention centers operated by Defendant. Among other duties, the Plaintiffs and Class Members searched for contraband and provided security, count, feed, and supervised detainees and inmates.

40.     Given the nature of the prisons, Defendant's facilities are secured by locked doors and metal detectors.  Prior to the COVID-19 Pandemic, the Plaintiffs and Class Members began their workday when they began a security screening in the lobby of the prison facilities. Indeed, when the Plaintiffs and Class Members arrived at the prison centers, they were first required to undergo a security screening to ensure that they did not inadvertently bring contraband or anything harmful into the facility.

41.     During the security screening, the Plaintiffs and Class Members emptied their pockets, emptied their bags, removed their shoes, removed their belts, removed their jackets, removed all metal objects, and submitted any personal items in their possession for inspection.

42.     They then walked through a metal detector and underwent a further search if any metal objects were detected.  After clearing the metal detector, the Plaintiffs and Class Members were able to gather their belongings.

43.     The Plaintiffs and Class Members then put on their clothing, including their shoes, belts, and jackets.

44.     This security screening time lasted approximately 10-20 minutes per day and went uncompensated by Defendant.  Additionally, the time it takes to complete the security screening is readily identifiable and calculable.  Defendant has digital records showing the time when each

person clears the security screening.  Additionally, Defendant has surveillance records identifying this time.  Thus, Defendant is in possession of records that show the 10-20 minute per day average time to clear the security screening across its facilities.

45.     The security screenings were required by Defendant and the Plaintiffs and Class Members were told in advance the time they were required to be at the prison centers.

46.     The security screenings were also necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons and to search for contraband. The security screenings were also undertaken on Defendant's premises, were controlled and required by Defendant, and undertaken primarily for the benefit of Defendant.

47.     Indeed, Defendant required the Plaintiffs and Class Members to undergo this screening for the purposes of overall safety in the prison and to prevent the officers from inadvertently or intentionally bringing contraband into the prison centers.

48.     These security screenings prevented weapons and other contraband from entering the prison, and in doing so, was necessarily tied to the correctional officers' work of providing security and searching for contraband. Thus, the security screening and the work of the correctional officers shared the same purpose. In fact, the screening time was tied to the productive work of supervising and providing security by the officers.  They were hired to ensure safety and the security screening was necessary to keep the prisons safe.

49.     Defendant could not have eliminated the screenings altogether without impairing the officers' ability to complete their work.  If Defendant eliminated the security screening, officers could inadvertently or intentionally bring weapons or other contraband into the prison.  The introduction of weapons and other contraband into the prison would most certainly result in a less

secure prison and would impair the officers' ability to provide security, supervise the inmates/detainees, and search for contraband.

50.     Additionally, preventing weapons and other contraband from entering the prison was an essential element of the officers' job duties with the ultimate purpose to maintain a secure prison environment.

51.     As noted above, Defendant did not pay for the time spent by Plaintiffs and the Class Members going through the security screening.

## PRE-SHIFT EQUIPMENT GATHERING

52.     After clearing the security screening, the Plaintiffs' and Class Members' workday continues.  They are then required to collect their duty belts and other required equipment to perform their work for Defendant, including radios, handcuffs, pepper sprays, and keys.  They gather this equipment from the equipment booth located in the control center.  This equipment is necessary for the Plaintiffs and Class Members to perform their work in ensuring safety and security at the prisons.  Gathering and donning this equipment must be performed on the premises of Defendant after clearing the security screening because the Plaintiffs and Class Members cannot bring this equipment into the facility, cannot clear the metal detector while wearing this equipment, and this equipment is in the possession of Defendant to ensure that all needed equipment for the safety and security of the prisons is properly maintained.

53.     To gather this equipment, the Plaintiffs and Class Members have to wait in line at the equipment booth in the control center.  The time it takes to wait in line, gather the equipment, and put on the equipment takes approximately 10-15 minutes.

54.     Additionally, the time it takes to complete the security screening is readily identifiable and calculable.  Defendant has surveillance records identifying this time.

55.     Gathering and donning the equipment was necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons and to search for contraband.   As noted above, gathering and donning the equipment was undertaken on Defendant's premises, was controlled and required by Defendant, and undertaken primarily for the benefit of Defendant.

56.     These activities were necessary to ensure the overall safety in the prison, which was the primary job function performed by the Plaintiffs and Class Members. These activities were necessary to perform the productive work of supervising and providing security in the prisons.

57.     Defendant could not have eliminated this equipment without impairing the Plaintiffs' and Class Members' ability to complete their work.   If Defendant eliminated this equipment, the Plaintiffs and Class Members could not effectively perform their job in maintaining a secure prison environment. For example, if an inmate was behaving violently, a correctional officer could not subdue that inmate without the pepper spray and handcuffs.

58.     Defendant did not pay the Plaintiffs and Class Members for this time spent working.

59.     However, this time should have been compensated by Defendant.

### PRE-SHIFT BRIEFING AND COMMUNICATION WITH OUTGOING CORRECTIONAL OFFICERS

60.     After being assigned and donning their equipment, the Plaintiffs and Class Members continued to perform unpaid work while walking to their assigned posts inside the prisons.   This time is compensable because the Plaintiffs and Class Members have to remain vigilant at all times, observe and correct inmate behavior, respond to any security breaches, and identify any safety issues.  If an alarm sounds while the Plaintiffs and Class Members are walking to their posts, they have to immediately respond to the emergency.   Thus, this time is predominately for the benefit of Defendant.

61.     After the Plaintiffs and Class Members arrived at their assigned posts, they were required by their supervisors to attend a pre-shift briefing with the correctional officers they were relieving.  During this time, the Plaintiffs and Class Members discussed what occurred during the prior shift and the current proceedings at the facility.  For example, if there are any inmates that may have behaved erratically during the prior shift, that information is disclosed to the incoming correctional officer.  They also discussed any other security incidents, such as any fights or contraband issues.  While the incoming and outgoing correctional officers communicated with each other, only one officer was paid at a given time because there was not any overlap allocated for this in the schedules for the officers.  Thus, because Defendant only paid for scheduled time, which did not account for two officers being at the post at the same time, Defendant did not pay for all time that was worked by the Plaintiff and Class Members.

62.     The time it takes to walk to the assigned post and attend the pre-shift briefing was approximately 10-15 minutes.  This time constitutes compensable work time because it was necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons and to search for contraband.  As noted above, these activities were undertaken on Defendant's premises, were controlled and required by Defendant, and undertaken primarily for the benefit of Defendant.

63.     These activities were necessary to ensure the overall safety in the prison, which was the primary job function performed by the Plaintiffs and Class Members. These activities were necessary to perform the productive work of supervising and providing security in the prisons.

64.     Defendant could not have eliminated these activities without impairing the Plaintiffs' and Class Members' ability to complete their work.  If Defendant eliminated these

activities, the Plaintiffs and Class Members could not effectively perform their job in maintaining a secure prison environment.

65.     Defendant did not pay the Plaintiffs and Class Members for this time spent working.

66.     However, this time should have been compensated by Defendant.

**PHYSICAL AND MEDICAL EXAMINATION FOR COVID-19**

67.     Moreover, since March 2020 and as a result of the COVID-19 Pandemic, the Plaintiffs and Class Members were required to undergo a physical and medical examination for COVID-19 prior to entering the facilities.  This examination was performed on the premises of Defendant in the parking lot.  During this examination, the Plaintiffs and Class Members were required to wait in line as another employee of Defendant examined them.  During this examination, the Plaintiffs and Class Members had their temperature checked and were asked a series of questions regarding their health condition, such as whether they had trouble breathing, were coughing, had a runny nose, and other questions regarding their health. The purpose of this screening was to ensure that the virus did not enter the prison.

68.     If a correctional officer did not initially pass the medical examination, that employee was moved to another section where a second examination occurs.  The employee was then asked a follow up series of medical questions to identify whether the officer currently had symptoms of COVID-19 and posed a potential health hazard.

69.     The amount of time it takes to undergo the COVID-19 medical examination from the time each Plaintiff and Class Member began waiting in line to the time they cleared the medical screening was approximately 10 to 15 minutes on average.  This amount of time could be longer if there are other employees in line for the COVID-19 medical examination or the officer failed the first screening.

70.     This medical screening should have been paid by Defendant because it constitutes compensable time worked.  During this time, Plaintiffs and the Class Members were subject to the control of Defendant.   Indeed, the Plaintiffs and the Class Members were required to follow Defendant's instructions while awaiting and during the COVID-19 medical screening.   The COVID-19 medical screening was required by Defendant and its employees were required to comply under threat of discipline, including possible termination.

71.     Additionally, the Plaintiffs and Class Members were confined to the premises of Defendant when they waited for and during the examination.

72.     Moreover, Defendant compelled its employees to perform specific tasks during the examination.  For example, they were required to wait in line, answer questions, and submit to have their temperature taken.

73.     In other words, Defendant directed, commanded and restrained its employees during the COVID-19 examination; prevented them from using that time effectively for their own purposes; and they remained subject to Defendant's control during the examination.

74.     Under the FLSA, the time spent undergoing the COVID-19 medical examination was compensable time that should have been paid by Defendant. The COVID-19 medical examinations were required by Defendant and Plaintiffs and the Class Members were told in advance the time they were required to be at the Defendant facilities.

75.     The COVID-19 medical examinations were also necessary to the principal work performed by the Plaintiffs and Class Members and were necessary to ensure a safe workplace. The COVID-19 medical examinations were also undertaken on Defendant's premises, were controlled and required by Defendant, and undertaken primarily for the benefit of Defendant.

76.    Indeed, Defendant required the Plaintiffs and Class Members to undergo this screening for the purposes of overall safety in the Defendant facilities and to prevent the Plaintiffs and Class Members from inadvertently or unintentionally infecting the Defendant facilities and causing a health hazard.  Indeed, the primary job duty of the Plaintiffs and Class Members was to ensure safety in the facilities and the medical examinations were necessary to maintain that safety.

77.    These COVID-19 medical examinations were necessary to ensure that the virus did not infect Defendant's facilities or the inmates.  The examinations were also necessary to ensure that the virus did not disrupt the work performed by the Plaintiffs and Class Members.  If Defendant did not have the COVID-19 medical screening, workers could inadvertently or unintentionally bring the virus into the Defendant facilities causing a mass breakout of the virus infecting hundreds to thousands of other workers and potentially infecting the inmates.

78.    Moreover, the Department of Labor has issued regulations stating that medical examinations, like the COVID-19 medical examination, constitutes time that should be paid for by employers. *See* 29 CFR § 785.43.

> In an opinion letter, the Department of Labor has further stated as follows: Time spent undergoing a physical examination is time during which the employee's freedom of movement is restricted for the purpose of serving the employer and time during which the employee is subject to the employer's discretion and control. It is immaterial whether the time spent in undergoing the required physical examination is during the employee's normal working hours or during nonworking hours. The physical examination is an essential requirement of the job and thus primarily for the benefit of the employer. **<u>Therefore, it is our opinion that the time so spent must be counted as hours worked under the FLSA.</u>**

DOL Wage and Hour Opinion Letter, January 26, 1998 (emphasis added).

79.    Given the amount of pre-shift work they were required to perform, the Plaintiffs and Class Members were required to arrive with sufficient time before the start of their shift to perform all of the work identified above. To perform all of the necessary pre-shift work, the

Plaintiffs and Class Members were required to arrive 30-45 minutes before the start of their scheduled shifts. However, they were not paid for any of the work they performed prior to the start of their scheduled shifts.

80.     The pre-shift work was compensable because the tasks were required by Defendant, performed on the premises of Defendant, and necessary for the Plaintiffs and Class Members to perform their work for Defendant.  Indeed, the pre-shift work identified above was necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons, to maintain the safety of the prisons, and to keep the prisons free of contraband.  The pre-shift work was also controlled and required by Defendant and undertaken primarily for the benefit of Defendant.

81.     The pre-shift work was also necessary to keep the prisons safe and secure – a primary duty of the Plaintiffs and Class Members.  In fact, the pre-shift work was directly tied to the productive work of supervising, providing security, and ensuring safety in the prisons by the Plaintiffs and Class Members.

82.     Defendant could not have eliminated the pre-shift work altogether without impairing the Plaintiffs' and Class Members' ability to complete their work.  Eliminating the pre-shift work, would most certainly result in a less secure and safe prison and would impair the Plaintiffs' and Class Members' ability to provide security, ensure safety, supervise the inmates/detainees, and search for contraband.

<u>**CONTINUOUS WORKDAY RULE**</u>

83.     Pursuant to the continuous workday rule, once the first compensable activity is performed, the continuous workday has started and all subsequent activities performed are compensable regardless of the amount of time each specific individual activity takes. *See* 29 C.F.R.

§ 790.6(a).   The continuous workday rule requires compensation from the start of the first compensable activity to the last compensable activity. *See id*.  Specifically, section 790.6(a) states as follows:

> Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.

*Id*.

84.    Thus, pursuant to the continuous workday rule, the Plaintiffs and Class Members are entitled to compensation from the time they first performed their principal activities. Defendant failed to do so.

## **POST SHIFT WORK**

85.    Defendant has also deprived the Plaintiffs and Class Members of overtime compensation by failing to compensate them for the time that Defendant suffered or permitted to them to engage in post-shift activities, each of which was required to be performed on the premises of Defendant.  Indeed, after the Plaintiffs' and Class Members' scheduled shifts were over, they were still required to perform significant post-shift work that went uncompensated.  At the end of their scheduled shifts, they were required to communicate with the incoming officer who was relieving them.  During this briefing, the incoming and outgoing officer discussed what transpired during the prior shift.  They discussed any problems with inmates, whether any fights had occurred, and other events during the prior shifts.

86.    Additionally, the outgoing officer was required to return his equipment at the Control Center.  To do so, the correctional officer was required to walk from his post back to the Control Center.  This time is compensable because the Plaintiffs and Class Members were required to remain vigilant at all times, observe and correct inmate behavior, respond to any security

18

breaches, and identify any safety issues.  If an alarm sounded while the Plaintiffs and Class Members were walking to the Control Center, they were required to immediately respond to the emergency.  Thus, this time is predominately for the benefit of Defendant.

87.     The post shift work normally lasted 10-15 minutes.  Again, the Plaintiffs and Class Members were not paid for this post shift work because they were only paid for the time when their shifts were scheduled to begin and end.

88.     The post shift work was compensable because the tasks were required by Defendant, performed on the premises of Defendant, and necessary for the Plaintiffs and Class Members to perform their work for Defendant.  Indeed, the post shift work identified above was necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons, to maintain the safety of the prisons, and to keep them free of contraband.  The post shift work was also controlled and required by Defendant and undertaken primarily for the benefit of Defendant.

89.     The post shift work was also necessary to keep the prisons safe and secure – a primary duty of the Plaintiffs and Class Members.  In fact, the post shift work was directly tied to the productive work of supervising, providing security, and ensuring safety in the prisons by the Plaintiffs and Class Members.

90.     Defendant could not have eliminated the post shift work altogether without impairing the Plaintiffs' and Class Members' ability to complete their work.  Eliminating the post shift work, would most certainly result in a less secure and safe prison and would impair the Plaintiffs' and Class Members' ability to provide security, ensure safety, supervise the inmates/detainees, and search for contraband.

## COMPENSATION OWED TO THE PLAINTIFFS AND CLASS MEMBERS

91.     Given the activities identified above, the Plaintiffs and Class Members were denied significant unpaid wages.

92.     The Plaintiffs and the Class Members were non-exempt employees.

93.     The Plaintiffs and the Class Members were paid on an hourly rate basis.

94.     When they worked more than forty hours in a workweek or 8 hours in a day, they were entitled to overtime pay.

95.     Indeed, the Plaintiffs and Class Members performed more than 8 hours and 10 minutes of work each day because they were required by Defendant to perform work before the start of their scheduled shifts and after the end of their scheduled shifts.

96.     The pre-shift activities identified above were not incidental activities for the Plaintiffs and Class Members, but instead, this time was integral and indispensable to their principal activity and was compensable.

97.     The post shift activities identified above were not incidental activities for the Plaintiffs and Class Members, but instead, this time was integral and indispensable to their principal activity and was compensable.

98.     Defendant's policy of only paying for the time the Plaintiffs and Class Members were scheduled to work instead of the time that they *actually* worked has caused significant harm to the Plaintiffs and Class Members.

99.     Due to the substantial pre-shift and post shift work, the Plaintiffs and Class Members were not paid for all time worked each day and as a result, they are owed significant overtime wages.

100.    Moreover, Defendant failed to pay the night shift differentials required under the law due to the same illegal policy described above.  Section 5545 of the FEPA requires Defendant

to pay premium pay to employees whose regularly scheduled work falls between the hours of 6 pm and 6 am. 5 U.S.C. § 5545(a).

101.    The Plaintiffs and Class Members were regularly scheduled to work between the hours of 6pm and 6am but were not paid the night shift premium that was owed under FEPA. Indeed, any correctional officer who worked the Day Shift was required to by Defendant to work between the hours of 6pm and 6am but was not paid the night shift premium.

102.    Defendant required its correctional officers to arrive prior to 6 am to work during the Day Shift.  When they arrived prior to 6 am, the correctional officers performed compensable work as noted in this Complaint.  However, the correctional officers were not paid for the time spent working prior to 6 am.

103.    The correctional officers were entitled to the night shift premium because they were told in advance to be on the premises of Defendant prior to 6 am, were required to work prior to 6 am, and were subject to discipline if they did not arrive prior to 6 am.

104.    Under these facts, the Plaintiffs and Class Members were not paid the night shift premiums required by law.  For example, Plaintiff Medrano was assigned the Day Shift from 6 am to 2 pm.  Given that she started performing work 30-45 minutes before 6 am (or 5:15 am – 5:30 am) she was not paid the night shift premium for the worked performed before 6 am.  Similarly, Plaintiff McQueary was assigned the Day Shift. Like Plaintiff Medrano, he was required to arrive 30-45 minutes before 6 am to perform work for Defendant.  Like Plaintiff Medrano, he was not paid the night shift premium during this time.

105.    Just like the Plaintiffs, the Class Members were also required to perform work between the hours of 6 pm and 6 am without full night shift pay.

106.    Defendant's method of paying Plaintiff and the Class Members in violation of FLSA and FEPA was willful and was not based on a good faith and reasonable belief that the conduct complied with the law. Defendant knew the requirement to pay for all time worked, but intentionally and/or recklessly chose not to do so.

107.    Indeed, Defendant has been repeatedly found liable for the conduct described in this Complaint.

### COUNT ONE: FAILURE TO PAY OVERTIME WAGES
**(On Behalf of Plaintiffs and the FLSA Class Members)**

108.    Plaintiffs incorporate all allegations contained in the foregoing paragraphs.

109.    Section 7(a) of the FLSA, 29 U.S.C. § 207(a)) provides that an employer shall pay its employees at a rate no less than time-and-a-half for all hours worked more than forty (40) hours per workweek.

110.    Additionally, section 551.501 of the Code of Federal Regulations, 5 C.F.R. § 551.501, provides that federal agency employers shall compensate their employees at a rate of no less than time-and-a-half for all hours worked more than eight hours per day and/or 40 hours per workweek.

111.    The Plaintiffs and Class Members are employees entitled to overtime wages.

112.    None of the exemptions provided by the FLSA regulating the duty of employers to pay overtime at a rate not less than one and one-half times the regular rate at which its employees are paid are applicable to Defendant, Plaintiffs, or the Class Members.

113.    Pursuant to 29 U.S.C. § 216(b), the Plaintiffs and Class Members are entitled to recover their unpaid overtime wages and liquidated damages in an amount equal to their unpaid wages.

114.    Further, pursuant to the Back Pay Act, 5 U.S.C. § 5596, the Plaintiffs and Class Members are entitled to recover interest on the back wages owed to them due to Defendant's failure to pay overtime wages.

115.    The Plaintiffs and Class Members are also entitled to recover their attorneys' fees and costs pursuant to 29 U.S.C. § 216(b) and the Back Pay Act, 5 U.S.C. § 5596.

## COLLECTIVE ACTION ALLEGATIONS

116.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

117.    Plaintiffs have actual knowledge that the FLSA Class Members have also been denied overtime pay for hours worked over 8 hours per day and/or forty (40) hours in a workweek because of Defendant's policy of only paying for *scheduled* hours worked and not *actual* hours worked.

118.    Plaintiffs' knowledge is based on their personal work experience and through communications with other workers.

119.    Other workers similarly situated to Plaintiffs throughout the United States were also not paid full overtime wages due to Defendant's illegal policy.

120.    Although Defendant permitted and/or required the FLSA Class Members to work more than 8 hours per day and 40 hours per week, Defendant denied them full compensation for their overtime hours.

121.    The FLSA Class Members are not exempt from receiving overtime pay.

122.    The FLSA Class Members are similar to the Plaintiffs in terms of relevant job duties, pay structure, work conditions, and the denial of overtime pay.

123.     Defendant's failure to pay overtime compensation at the rates required by the FLSA and section 551.501 results from generally applicable policies or practices and does not depend on the personal circumstances of any potential Plaintiff.

124.     The experiences of the Plaintiffs, with respect to their pay, hours, and duties are typical of the experiences of the FLSA Class Members.

125.     The specific job titles or precise job responsibilities of each FLSA Class Member does not prevent collective treatment.

126.     Although the exact amount of damages may vary among the FLSA Class Members, the damages for the FLSA Class Members can be easily calculated by a simple formula. The claims of all FLSA Class Members arise from a common nucleus of facts. Liability is based on a systematic course of wrongful conduct by Defendant that caused harm to all FLSA Class Members.

127.     As such, the class of similarly situated Plaintiffs for the FLSA Class is properly defined as follows:

> **All current and former correctional officers who worked for Defendant at any time during the three year period prior to the filing of this Complaint to the present.  Excluded from the class are any correctional officers who worked for Defendant at the United States Penitentiary Lee near Pennington Gap, Virginia, the Federal Correctional Institution Sheridan, or the Federal Detention Center in Sheridan, Oregon.**

### COUNT TWO: FAILURE TO PAY NIGHT SHIFT PAY
**(On Behalf of Plaintiffs and the Rule 23 Class Members)**

128.     Plaintiffs incorporate all allegations contained in the foregoing paragraphs.

129.     Section 5545 of the FEPA requires Defendant to pay premium pay to employees whose regularly scheduled work falls between the hours of 6 pm and 6 am.  Specifically, section 5545(a) states as follows:

(a)Except as provided by subsection (b) of this section, nightwork is regularly scheduled work between the hours of 6:00 p.m. and 6:00 a.m., and includes—

(1)periods of absence with pay during these hours due to holidays; and

(2) periods of leave with pay during these hours if the periods of leave with pay during a pay period total less than 8 hours.

Except as otherwise provided by subsection (c) of this section, an employee is entitled to pay for nightwork at his rate of basic pay plus premium pay amounting to 10 percent of that basic rate. This subsection and subsection (b) of this section do not modify section 5141 of title 31, or other statute authorizing additional pay for nightwork.

130.   The Plaintiffs' and Rule 23 Class Members' regularly scheduled work required them to perform work between the hours of 6 pm and 6 am without full night shift premium pay.

131.   In fact, Defendant regularly required Plaintiffs and the Class Members to complete work between the hours of 6 pm and 6 am as part of their regularly scheduled work.

132.   During one or more workweeks during the six years prior to the filing of this lawsuit, Defendant failed to pay Plaintiffs and the Rule 23 Class Members premium payments for work performed between 6 pm and 6 am, in violation of Section 5545 of the FEPA.

133.   The Plaintiffs and Rule 23 Class Members seek all unpaid wages during the hours 6 pm and 6 am, night shift premiums for work performed between the hours of 6 pm and 6 am, attorneys' fees, costs, and interest.

## COUNT THREE: DECLARATORY RELIEF
### (On Behalf of Plaintiffs and the Rule 23 Class Members)

134.   Plaintiffs repeat and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

135.    An actual controversy has arisen and now exists between Plaintiffs and the Rule 23 Class Members, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the Parties regarding compensation and hours of work.

136.    Defendant fails to pay for all pre-shift and post-shift work performed by the Plaintiffs and Rule 23 Class Members.

137.    Plaintiffs, on behalf of themselves and the Rule 23 Class Members, seek a declaration as to the Parties' respective rights and requests that the Court declare that Defendant's conduct is illegal, as alleged in this Complaint, so that future controversies may be avoided and to direct Defendant to pay the Plaintiffs and Rule 23 Class Members all unpaid wages due and premium payments due during the class period.

## RULE 23 CLASS ACTION ALLEGATIONS

138.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

139.    Plaintiffs bring their claims under section 5545 of the FEPA as a Rule 23 class action on behalf of the following class:

> **All current and former correctional officers who worked for Defendant at any time during the six year period prior to the filing of this Complaint to the present.**

140.    Although Plaintiffs do not know the precise number of members of the proposed Class, Plaintiffs believe there are more than 50,000 individuals that fit into the Class.

141.    The members of the Class are so numerous that their individual joinder is impractical.

142.    The identity of the members of the Class is readily discernible from Defendant's records.

143.     Plaintiffs and the Rule 23 Class on one hand, and Defendant on the other, have a commonality of interest in the subject matter and remedy sought, namely night shift premiums plus interest, attorneys' fees and the cost of this lawsuit.

144.     Common questions of law and fact exist to all members of the Class. These questions predominate over the questions affecting individual class members. These common legal and factual questions include, but are not limited, to the following:

a.   Whether Plaintiffs and the Rule 23 Class Members performed compensable work between the hours of 6 pm and 6 am without pay;

b.   Whether Plaintiffs and the Rule 23 Class Members were paid night shift premiums for all hours worked between the hours of 6 pm and 6 am;

c.   Whether security screening time is compensable;

d.   Whether the time spent gathering equipment is compensable;

e.   Whether the time spent in pre-shift briefings is compensable;

f.   Whether the time undergoing COVID-19 screenings is compensable.

145.     These and other common questions of law and fact, which are common to the members of the Class, predominate over any individual questions affecting only individual members of the Class.

146.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were not paid the wages in accordance with federal law just as the Rule 23 Class Members were not paid the wages in accordance with federal law, namely FEPA.

147.     Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class that they seek to represent. Plaintiffs have retained competent counsel, highly experienced in complex class action litigation, and they intend to

prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

148.    The class action under federal law (FEPA) is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Rule 23 Class Members. The injuries suffered by each individual class member are relatively small in comparison to the burden and expense of individual prosecution of a complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class to individually redress the wrongs done to them; even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents the possibility for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex, legal and factual issues of the case. By contrast, the class action presents far fewer logistical issues and provides the benefits of a single adjudication, economy of scale and comprehensive supervision by a single court.

## PRAYER

149.    For these reasons, Plaintiffs pray for:

    a.  Any order declaring that Defendant's failure to pay the Plaintiffs and the Class Members for their pre-shift and post-shift work violated federal law;

    b.  An order certifying this case as a class action under Rule 23 and as a collective action under the FLSA;

    c.  A judgment against Defendant awarding Plaintiffs and the Class Members all their unpaid wages, overtime compensation, night shift premiums, and liquidated damages;

    d.  An order awarding attorneys' fees, costs, and expenses;

    e.  Pre- and post-judgment interest at the highest applicable rates; and

    f.  Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By:   /s/ Don J. Foty
     Don J. Foty
     Hodges & Foty, LLP
     dfoty@hftrialfirm.com
     Texas Bar No. 24050022
     4409 Montrose Blvd., Suite 200
     Houston, TX 77006
     Telephone: (713) 523-0001
     Facsimile: (713) 523-1116

     And

     David W. Hodges
     Hodges & Foty, LLP
     dhodges@hftrialfirm.com
     Texas Bar No. 00796765
     4409 Montrose Blvd., Suite 200
     Houston, TX 77006
     Telephone: (713) 523-0001
     Facsimile: (713) 523-1116

     Of Counsel

     And

     Anthony J. Lazzaro
     The Lazzaro Law Firm, LLC
     anthony@lazzarolawfirm.com
     Ohio Bar No. 0077962
     The Heritage Building, Suite 250
     34555 Chagrin Boulevard
     Moreland Hills, Ohio 44022
     Phone:  216-696-5000
     Facsimile:  216-696-7005

     Of Counsel

     ATTORNEYS FOR PLAINTIFFS AND CLASS
     MEMBERS