No. 20-1245-C
(Judge Schwartz)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LAURA MEDRANO, ET AL.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST
AMENDED COLLECTIVE ACTION AND CLASS ACTION COMPLAINT

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

JOHN T. LeMASTER
Senior Counsel
Staff Training Academy
1131 Chapel Crossing Rd, Bldg. 21
Glynco, GA 31524

DAVID M. KERR
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 307-3390
E-mail:  David.M.Kerr@usdoj.gov

Attorneys for Defendant

January 27, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ..................................................................... 1

ARGUMENT ........................................................................................... 4

I.      Legal Standard ............................................................................. 4

II.     Plaintiffs Have Failed To State A Claim For Relief Under FEPA ..................................... 6

        A.      FEPA Authorizes Premium Pay For Only Regularly Scheduled Work .................... 6

        B.      Plaintiffs' Claim For Night Pay For Pre-Shift Activities Fails As A
                Matter Of Law ................................................................. 7

III.    Plaintiffs Have Failed To State A Claim For Relief Under FLSA .................................. 10

        A.      FLSA Authorizes Overtime Pay For Only Integral And Indispensable
                Activities ................................................................... 10

        B.      Plaintiffs' Claim For Overtime Compensation For Pre- And Post-Shift
                Activities Fails As A Matter Of Law ........................................ 12

                1.      COVID-19 Screening And Security Screening Are Not Intrinsic
                        Elements Of Plaintiffs' Principal Activities ..................... 12

                2.      Waiting In Line, Collecting Equipment, Walking To Post, And
                        Exchanging Information Are Not Intrinsic Elements Of Plaintiffs'
                        Principal Activities Or Are De Minimis ........................... 18

                3.      Exchanging Information, Walking Back To The Control Center,
                        And Returning Equipment Are Also Not Intrinsic Elements Of
                        Plaintiffs' Principal Activities Or Are De Minimis ............... 22

IV.     Plaintiffs Have Failed To State A Claim For Relief Under The Back Pay Act ................ 24

V.      Plaintiffs Have Failed To State A Claim For Declaratory Relief .................... 25

CONCLUSION ..................................................................................... 26

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abbey v. United States,*
 99 Fed. Cl. 430 (2011) ................................................................................... 11, 12

*Aguilar v. Mgmt. & Training Corp.,*
 948 F.3d 1270 (10th Cir. 2020) .......................................................................... 18

*Anderson v. Mt. Clemens Pottery Co.,*
 328 U.S. 680 (1946) ............................................................................................. 11

*Anderson v. United States,*
 201 Ct. Cl. 660 (1973) ........................................................................................ 8, 9

*Arneson v. Callahan,*
 128 F.3d 1243 (8th Cir. 1997) ............................................................................. 24

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ...................................................................................... passim

*Aviles v. United States,*
 151 Ct. Cl. 1 (1960) ................................................................................................ 8

*Battery Workers' Union Local 113 v. Elec. Storage Battery Co.,*
 78 F. Supp. 947 (E.D. Pa. 1948) ......................................................................... 21

*Bautista v. L.A. Cnty.,*
 216 F.3d 837 (9th Cir. 2000) ................................................................................. 5

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ............................................................................................... 5

*Bell v. United States,*
 No. 13-455L, 2016 WL 3172401 (Fed. Cl. June 6, 2016) ..................................... 5

*Bobo v. United States,*
 136 F.3d 1465 (Fed. Cir. 1998) ..................................................................... 11, 19

*Bradley v. Chiron Corp.,*
 136 F.3d 1317 (Fed. Cir. 1998) ................................................................ 4, 13, 16

*Burich v. United States,*
 366 F.2d 984 (Ct. Cl. 1966) ................................................................................... 8

*Carlsen v. United States*,
    72 Fed. Cl. 782 (2006), *aff'd*, 521 F.3d 1371 (Fed. Cir. 2008)........................................... passim

*Doe v. United States*,
    63 Fed. Cl. 798 (2005)........................................................................................................ 6

*Doe v. United States*,
    372 F.3d 1347 (Fed. Cir. 2004) ......................................................................................... 8

*Ellipso, Inc. v. Mann*,
    460 F. Supp. 2d 99 (D.D.C. 2006)..................................................................................... 2

*Ghaffari v. United States*,
    125 Fed. Cl. 665 (2016) ................................................................................................... 25

*Henderson v. Cuyahoga Cnty.*,
    2020 WL 5706415 (N.D. Ohio Sept. 24, 2020) ........................................................... 18

*Hodgson v. Katz & Besthoff, No. 38, Inc.*,
    365 F. Supp. 1193 (W.D. La. 1973) ............................................................................... 11

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005) ..................................................................................................... 19, 20

*Integrity Staffing Sols., Inc. v. Busk*,
    574 U.S. 27 (2014) ............................................................................................. 11, 14, 18

*Kam-Almaz v. United States*,
    682 F.3d 1364 (Fed. Cir. 2012) ......................................................................................... 5

*Refaei v. United States*,
    129 Fed. Cl. 1 (2016), *aff'd*, 725 F. App'x 945 (Fed. Cir. 2018) ............................... 24

*Schweiker v. Hansen*,
    450 U.S. 785 (1981) ........................................................................................................... 9

*Shell Oil Co. v. United States*,
    148 Fed. Cl. 781 (2020), *appeal docketed*, No. 20-2221 (Fed. Cir. Aug. 31, 2020).................. 4

*Smith v. United States*,
    120 Fed. Cl. 455 (2015)...................................................................................................... 2

*Steiner v. Mitchell*,
    350 U.S. 247 (1956) ......................................................................................................... 10

*United Pac. Ins. Co. v. United States*,
  464 F.3d 1325 (Fed. Cir. 2006) ................................................................ 4

*United States v. King*,
  395 U.S. 1 (1969) ...................................................................................... 25

*Whalen v. United States*,
  93 Fed. Cl. 579 (2010) ............................................... 11, 14, 19, 20, 23

## Statutes

5 U.S.C. § 5545 ................................................................................... passim

5 U.S.C. § 5596 ........................................................................................ 24

28 U.S.C. § 1491(a)(2) ............................................................................. 25

28 U.S.C. § 2201 ...................................................................................... 25

28 U.S.C. § 2202 ...................................................................................... 25

29 U.S.C. § 203 .......................................................................................... 1

29 U.S.C. § 204(f) .................................................................................... 15

29 U.S.C. § 216(b) ............................................................................... 2, 24

29 U.S.C. § 254 ............................................................................. 11, 20, 23

## Regulations

5 C.F.R. § 550.103 ................................................................................. 6, 8

5 C.F.R. § 550.112 ................................................................................... 12

5 C.F.R. § 550.121(a) ................................................................................ 6

5 C.F.R. § 551.412 ..................................................................... 10, 11, 19

5 C.F.R. § 610.111 .................................................................................. 6, 8

29 C.F.R. § 785.43 ............................................................................. 14, 15

## Other Authorities

7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1656 (2016) ................................ 5

*Medical Attention for Nonwork Injuries/Hours Worked,*
    U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Jan. 26, 1996) .............................. 15

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Jan. 26, 1998).............................. 15, 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAURA MEDRANO, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 20-1245C |
| v. | ) | Judge Schwartz |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COLLECTIVE ACTION AND CLASS ACTION COMPLAINT

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests the Court to dismiss the amended complaint because it fails to state a claim.  In support of this request, we rely upon the complaint and the following brief.

### STATEMENT OF THE ISSUES

Whether plaintiffs Laura Medrano and Michael McQueary have stated a claim for relief under the Federal Employees Pay Act (FEPA), 5 U.S.C. § 5545, by asserting a claim for night premium pay for activities engaged in prior to their scheduled shifts.

Whether plaintiffs Ms. Medrano, Mr. McQueary, and the 15 other plaintiffs have stated a claim for relief under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203, by asserting that the time it takes for the pre- and post-shift activities of passing through COVID-19 screening and security screening; waiting in line; collecting and returning equipment; walking to and from post; and exchanging information is compensable overtime.

### STATEMENT OF THE CASE

Plaintiffs Medrano and McQueary, who are correctional officers at Federal Correctional

1

Complex (FCC) Victorville, filed their original complaint on September 22, 2020.  ECF No. 1.

The United States moved to dismiss the original complaint on November 23, 2020.  ECF No. 9.

Plaintiffs filed an amended complaint on December 14, 2020 (ECF. No. 10) and a response to

our motion to dismiss on December 21, 2020 (ECF No. 11), in which plaintiffs assert that our

motion to dismiss is now moot because they filed an amended complaint.  We agree that the

Court should deny our motion to dismiss plaintiffs' original complaint without prejudice, and

consider instead this motion based on plaintiffs' amended complaint. *See Smith v. United States*,

120 Fed. Cl. 455, 460 (2015) (quoting *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 103 (D.D.C.

2006)) ("Where a party amends its complaint, a pending motion to dismiss the original complaint

is ordinarily denied without prejudice so that the movant can re-file the motion based on the

amended pleading.").

      In count one of their amended complaint, plaintiffs Medrano and McQueary assert that

the United States violated the FLSA by failing to provide them with overtime pay for performing

various activities before and after their shifts.  These activities include undergoing COVID-19

and security screenings, waiting in line, collecting and returning equipment, walking to and from

their post, and exchanging information before and after their shifts.  Plaintiffs Medrano and

McQueary assert that the United States thus owes them and similarly situated current and former

correctional officers overtime pay under the FLSA.

      Count one, accordingly, was brought as a putative collective action under the FLSA.  *See*

29 U.S.C. § 216(b) ("An action to recover the liability prescribed in the preceding sentences may

be maintained against any employer (including a public agency) in any Federal or State court of

competent jurisdiction by any one or more employees for and in behalf of himself or themselves

and other employees similarly situated.").

Plaintiffs propose the following collective for their FLSA claim:  "[A]ll current and former correctional officers who worked for Defendant at any time during the three year period prior to the filing of this Complaint to the present. . .  [excluding] any correctional officers who worked for Defendant at the United States Penitentiary Lee near Pennington Gap, Virginia, the Federal Correctional Institution Sheridan, or the Federal Detention Center in Sheridan, Oregon."  ECF No. 10, ¶ 25.  According to the amended complaint, fifteen other plaintiffs, Lucas Meyer, Ryan Howell, Marlen Rodriguez, Marquis Mosely, Geoffrey McCreary, Demarcus Taylor, Deon Scott, Juan Flores, Jerry Motley, Eva Garciatadeo, Jarred Chandler, Christopher Palomares, Jasara Acosta, John Sida, and Jason McDonald, have joined the FLSA collective action.  ECF No. 10, ¶ 1 & n.1.

In count two of their amended complaint, plaintiffs Medrano and McQueary assert that the United States violated FEPA by failing to pay them, and others similarly situated, premium pay for "nightwork" as provided under 5 U.S.C. § 5545.  Plaintiffs Medrano and McQueary, accordingly, brought count two as a putative class action under Rule 23 of the RCFC.  In count three, which is a claim for declaratory relief, they propose the following definition for the FEPA-claim class:  "All current and former correctional officers who worked for Defendant at any time during the six year period prior to the filing of this Complaint to the present."  ECF No. 10, ¶ 139.[1]

Plaintiffs Medrano and McQueary seek night pay for pre-shift activities.  Critically, plaintiffs Medrano and McQueary do not seek night pay for work *scheduled* between 6 p.m. and

---

[1]  Because we request the Court to dismiss plaintiffs' complaint, we do not address whether the case should proceed as an FLSA collective and a Rule 23 class action.  If the Court were to decline to dismiss plaintiffs' complaint, we reserve our right to contest plaintiffs' assertions that their FLSA claims should proceed as a collective action and that their FEPA claims should proceed as a Rule 23 class action, and plaintiffs' proposed definitions of a collective and a class.

6 a.m. as required by FEPA.  And all of the plaintiffs seek overtime compensation for pre- and post-shift activities—COVID 19 and security screenings, waiting in line, collecting and returning equipment, walking to and from their post, and exchanging information before or after their shift—that are not considered work or are de minimis.  The amended complaint, therefore, fails to adequately state a claim for night pay under FEPA or for overtime pay under the FLSA. Accordingly, we respectfully request that the Court dismiss the amended complaint.

ARGUMENT

I.    Legal Standard

A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006) (internal quotation marks omitted).  In reviewing a motion to dismiss for failure to state a claim, the Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant."  *Id*. at 1327-28 (internal quotation marks omitted).

However, conclusory statements of law or fact "are not entitled to the assumption of truth" and "must be supported by factual allegations."  *Shell Oil Co. v. United States*, 148 Fed. Cl. 781, 788 (2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)), *appeal docketed*, No. 20-2221 (Fed. Cir. Aug. 31, 2020).  Accordingly, "naked assertions devoid of further factual enhancement are insufficient to state a claim."  *Id*. (internal quotation marks omitted); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

The factual allegations pled must also plausibly suggest, not merely be consistent with, a showing of entitlement to relief, and the facts as alleged must be enough to raise a right to relief

4

above the speculative level.  *See Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Asking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."  *Twombly*, 550 U.S. at 556.

"To survive a motion to dismiss," therefore "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

Furthermore, the complaint must contain sufficient factual content to show that each individual plaintiff states a claim upon which relief can be granted.  *See Bell v. United States*, No. 13-455L, 2016 WL 3172401, at *5 (Fed. Cl. June 6, 2016) (the "rule [permitting joinder] does not excuse any of the joined parties from the obligation to state a claim against defendant . . .  Noncompliance with this requirement leaves a party vulnerable to a Rule 12(b)(6) motion to dismiss." (quoting 7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1656)); *see also Bautista v. L.A. Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000) ("To comply with Rule 8 *each* plaintiff must plead a short and plain statement of the elements of his or her claim." (emphasis added)).

II.    Plaintiffs Have Failed To State A Claim For Relief Under FEPA

    A.    FEPA Authorizes Premium Pay For Only Regularly Scheduled Work

Title 5 U.S.C. § 5545(a) authorizes pay for "nightwork at [an employee's] rate of basic pay plus premium pay amounting to 10 percent of that basic rate."  *Id.*  Nightwork is "regularly scheduled work between the hours of 6:00 p.m. and 6:00 a.m."  5 U.S.C. § 5545(a).  Regulations issued by the Office of Personnel Management (OPM) implementing this and other premium pay provisions under FEPA similarly provide that "nightwork is regularly scheduled work performed by an employee between the hours of 6 p.m. and 6 a.m."  5 C.F.R. § 550.121(a).  "Regularly scheduled work" is defined in OPM's regulations as "work that is scheduled in advance of an administrative workweek under an agency's procedures for establishing workweeks in accordance with § 610.111 . . . ."  5 C.F.R. § 550.103.

Section 610.111 requires that "[t]he head of each agency, with respect to each full-time employee to whom this subpart applies, shall establish by a written agency policy statement" a basic workweek of 40 hours, specifying the days and hours of the workweek, and a "regularly scheduled administrative workweek" that includes "the period of regular overtime work, if any, required of each employee."  5 C.F.R. § 610.111(a).

There can be no doubt that under section 5545 and implementing regulations that employees are paid a premium for only work performed between 6 p.m. and 6 a.m. that is *scheduled* in advance and in writing.  Construing a similar FEPA provision for holiday premium pay, the Court confirmed that "the work must be 'scheduled.'"  *Doe v. United States*, 63 Fed. Cl. 798, 802 (2005) (holding that holiday premium pay under FEPA is authorized for only work scheduled for a holiday).

B.    Plaintiffs' Claim For Night Pay For Pre-Shift Activities Fails As A Matter
       Of Law

Plaintiff Medrano alleges that she "was assigned the Day Shift from 6 am to 2 pm," but

"started performing work 30-45 minutes before 6 am (or 5:15 am – 5:30 am)" and asserts that

she should, therefore, be "paid the night shift premium for the work[ ] performed before 6 am."

ECF No. 10, ¶ 104.  "Similarly, Plaintiff McQueary was assigned the Day Shift," but "required

to arrive 30-45 minutes before 6 am to perform work for Defendant," and asserts that he should

"be paid the night shift premium during this time."  *Id.*

Plaintiffs Medrano and McQueary are thus not seeking compensation for work performed

during their regularly *scheduled* shifts.  There are no allegations of uncompensated nightwork

performed during a regularly scheduled shift.  *See, e.g.*, ECF No. 10-1.  Rather, plaintiffs are

seeking night pay for activities before their *scheduled* shifts:  "Defendant has systematically

violated the law by instituting a policy of only paying Plaintiffs and the Class Members for their

*scheduled* shift time while requiring the Plaintiffs and Class Members to perform work both

before the start of their *scheduled* shifts and after the end of their *scheduled* shifts without pay."

ECF No. 10, ¶ 32 (emphases added); *see also* ¶ 2 (asserting that plaintiffs were paid only "for the

time they were scheduled to work instead of the time they *actually* performed work for

Defendant.").

In Section III, we show that these pre-shift activities are not compensable work as

plaintiffs assert, but even if they were compensable work, because these activities indisputably

occurred before Ms. Medrano and Mr. McQueary's regularly *scheduled* shifts, plaintiffs are not

entitled to night premium pay for these activities as a matter of law.  5 U.S.C. § 5545(a)

("nightwork is regularly scheduled work between the hours of 6:00 p.m. and 6:00 a.m.").

Plaintiffs appear to argue that they are entitled to night pay for unscheduled pre-shift

activities because they had to perform them "regularly" prior to each 6 a.m. shift, but as the United States Court of Claims explained in *Anderson v. United States*, in considering whether overtime was "regularly scheduled," regularly means "regularly prescribed according to the statutes and regulations applicable" not that it occurs frequently.  201 Ct. Cl. 660, 665 (1973), *overruled on other grounds by Doe v. United States*, 372 F.3d 1347, 1357 (Fed. Cir. 2004) ("[T]he *Anderson* line of cases is no longer good law and . . . the written order requirement is not invalid.").  As a result, "overtime that was added on to every work day of the year could semantically be 'irregular' if not ordered and directed according to law."  *Id.; see also Burich v. United States*, 366 F.2d 984, 988-89 (Ct. Cl. 1966) ("[T]o the extent [assignments received on a daily basis] involved overtime, it is clear that such overtime could be anticipated, but it could not be regulated [and thus could not be "regularly scheduled" overtime].").

The applicable regulations in this case require "regularly scheduled work" to be set forth in advance in writing.  5 C.F.R. §§ 550.103, 610.111(a).  Plaintiffs' allegation in paragraph 131 of their amended complaint that they were "regularly required" to complete pre-shift activities, even if true, would not satisfy the requirement under OPM's regulation that nightwork be scheduled in advance and in writing as part of an employee's workweek.  *Cf. Carlsen v. United States*, 72 Fed. Cl. 782, 793 n.29 (2006), *aff'd*, 521 F.3d 1371 (Fed. Cir. 2008) (holding in the context of overtime under FEPA that employees' argument that they are instructed "to be *at* their duty post by the start of their shift" fails "to meet the writing requirement of the OPM regulation.").  Alleged work that occurs prior to platiniffs' scheduled shift, by definition, does not take place during the prescribed workweek and thus cannot be nightwork under FEPA.

Plaintiffs may ask the Court to extend the Court of Claims's holding in *Aviles v. United States*, 151 Ct. Cl. 1 (1960), to the present case.  In *Aviles*, the Court of Claims held that the

overtime worked by Department of Agriculture meat inspectors who were required to stay on duty when meat processing facilities decided to operate into the night "was part of regularly scheduled tours of duty" even though it was not included in the regularly scheduled workweek established pursuant to the applicable regulations.  *Id.* at *6-7.  Uniquely, "*Aviles* was an equitable decision, treating that as done which ought to have been done."  *Anderson*, 201 Ct. Cl. at 666.

As an initial matter, because applying *Aviles* would require overlooking the regulatory requirement that the workweek be established in advance in writing, this equitable remedy is inconsistent with "the duty of all courts to observe the conditions defined by Congress for charging the public treasury."  *Schweiker v. Hansen*, 450 U.S. 785, 788-90 (1981) (holding that courts may not overlook a regulation requiring that Social Security applications be in writing).

Even if applying *Aviles* to the present case did not require overlooking a valid regulatory requirement, which it does, as in *Anderson*, it would involve "a most remarkable application of equitable principles."  *Anderson*, 201 Ct. Cl. at 666.  Employees in *Aviles* were required to remain at their posts, while the present case, like *Anderson*, involves a preparatory activity.  *Id.* at 665-66 (uniform changing).  We show in the next section that the pre-shift activities in this case are non-compensable preliminary activities or de minimis, but even if they constituted compensable work, the alleged 30 to 45 minutes they take would be compensable as (irregular) overtime.  *Id*. at 666 ("Equity here requires that the natural consequence should be drawn from defendant's failure to schedule the overtime as its own regulations required:  it was not regularly scheduled, therefore, it was irregular overtime and could be ordered locally.").  The alleged work prior to a scheduled shift cannot be compensable as nightwork because it is not part of a regularly scheduled workweek as required under FEPA.  Plaintiffs, therefore, have not asserted

facts that would entitle them to premium pay for nightwork under the FEPA.  Accordingly, we

respectfully request that the Court dismiss counts two and three of the amended complaint.[2]

III.    Plaintiffs Have Failed To State A Claim For Relief Under FLSA

    A.    FLSA Authorizes Overtime Pay For Only Integral And Indispensable Activities

As explained above, the amended complaint alleges that plaintiffs were required "to

perform work both before the start of their scheduled shifts and after the end of their scheduled

shifts without pay." ECF No. 10, ¶ 32.  In implementing the FLSA, OPM promulgated the

following binding government-wide regulation with respect to pre- and post-shift activities:

> If an agency reasonably determines that a preparatory or
> concluding activity is closely related to an employee's principal
> activities, and is indispensable to the performance of the principal
> activities, and that the total time spent in that activity is more than
> 10 minutes per workday, the agency shall credit all of the time
> spent in that activity, including the 10 minutes, as hours of work.
> . . .
> A preparatory or concluding activity that is not closely related to
> the performance of the principal activities is considered a
> preliminary or postliminary activity. Time spent in preliminary or
> postliminary activities is excluded from hours of work and is not
> compensable, even if it occurs between periods of activity that are
> compensable as hours of work.

5 C.F.R. § 551.412.

The United States Supreme Court has held that under the FLSA, "activities performed

either before or after the regular work shift . . . are compensable . . . if those activities are an

integral and indispensable part of the principal activities for which covered workmen are

employed."  *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).  However, "walking, riding, or

traveling to and from the actual place of performance of the principal activity or activities which

---

[2]  Plaintiffs allege that "[p]rior to June 2019, the Day Shift was 8 am to 4 pm." ECF No.
10, ¶ 36 n.3.  Prior to June 2019, therefore, the alleged overtime did not occur between 6 p.m.
and 6 a.m., which is thus another basis for dismissing plaintiffs' FEPA claim for the time prior to
June 2019.

such employee is employed to perform" and activities that are merely "preliminary [or] postliminary" are non-compensable.  29 U.S.C. § 254(a)(1)-(2); *see also Whalen v. United States*, 93 Fed. Cl. 579, 600-01 (2010) (finding that traveling from an inspection site to one's worksite on base is not a compensable work activity).  Time spent in a preliminary or postliminary activity, such as commuting, is excluded from hours of work and is not compensable, even if it occurs between periods of activity that are compensable as hours of work.  *See* 5 C.F.R. § 551.412(b).

For plaintiffs to adequately allege that an overtime activity is an integral and indispensable part of the principal activities for which they are entitled compensation, and therefore compensable "work," they must allege facts establishing that the overtime activity "is an *intrinsic* element of" the principal activities of their work and is "one with which the employee cannot dispense if he is to perform his principal activities."  *See Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014) (emphasis added) (holding that undergoing a security screening process is not an "integral and indispensable" activity).  "[M]erely because [an] activity regularly, even daily, precedes the entrance by the employee upon his principal activity, does not make such activity an integral and indispensable part of the employee's principal activities."  *Hodgson v. Katz & Besthoff, No. 38, Inc.*, 365 F. Supp. 1193, 1196–97 (W.D. La. 1973).

Moreover, the de minimis doctrine precludes "insubstantial and insignificant" activities from being considered compensable.  *Abbey v. United States*, 99 Fed. Cl. 430, 437 (2011) (internal quotations omitted).  Under this doctrine such "trifles" as "a few seconds or minutes of work beyond the scheduled working hours" may be "disregarded."  *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680,

692 (1946)).  An "agency is not obligated to pay overtime when this work takes ten minutes or

less."  *Carlsen*, 72 Fed. Cl. at 798-99 (citing 5 C.F.R. § 550.112).

To state a claim for relief that is plausible on its face, plaintiffs must allege factual

allegations of pre- and post-shift activities, which if accepted as true, would constitute

compensable "work" that "is reasonable in relation to the principal activity" and is "not de

minimis."  *See Abbey*, 99 Fed. Cl. at 436 (internal quotations omitted).

B.   Plaintiffs' Claim For Overtime Compensation For Pre- And Post-Shift
     Activities Fails As A Matter Of Law

Plaintiffs allege that they are entitled to overtime compensation for the time it takes to

pass through a COVID-19 screening and security screening; wait in line; collect and return

equipment; walk to and from their post; and exchange information before or after their shift.

These activities are either not an intrinsic element of the principal activities of plaintiffs' work or

are de minimis.

1.   COVID-19 Screening And Security Screening Are Not Intrinsic Elements Of
     Plaintiffs' Principal Activities

Plaintiffs allege that their principal activity is to "monitor the actions of others,"

presumably referring to the inmates held at the 122 institutions operated by the Bureau of Prisons

across the country.  ECF No. 10, ¶ 33.  They allege that their primary job duty "was to manage

and oversee the inmate population at the prison centers, to ensure safety at the prisons, and to

maintain security at the prisons."  *Id.* at ¶ 39.  According to plaintiffs, they "searched for

contraband and provided security, count, [fed], and supervised detainees and inmates."  *Id.*

With regard to the COVID-19 screening, plaintiffs allege that they "were required to wait

in line" in the parking lot of the facility for another employee to take their temperature and ask

them "a series of questions regarding their health condition, such as whether they had trouble

breathing, were coughing, had a runny nose, and other questions regarding their health."  *Id.* at

12

¶ 67.  Although plaintiffs assert that this screening is "necessary to the principal work performed by the Plaintiffs" (ECF No. 10, ¶ 75), "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim."  *Bradley*, 136 F.3d at 1322.

In fact, plaintiffs could still "monitor the actions of others" without undergoing the COVID-19 screening.  "The purpose of this screening," as plaintiffs point out, "was to ensure that the virus did not enter the prison" (ECF No. 10, ¶ 67), but keeping the facility safe from the virus is not closely related to plaintiffs alleged principal activities of searching for contraband, providing security, monitoring, supervising, counting, and feeding inmates (*id.* at ¶ 39). Plaintiffs allege that their primary duty "was to ensure safety in the facilities" and that they "undergo this screening for the purpose of overall safety in the Defendant facilities" (*id.* at ¶ 76), but the fact that plaintiffs help keep the facility safe by monitoring and supervising inmates does not make every aspect of facility safety part of their principal activities.

In other words, when considering whether undergoing COVID-19 screening is an "integral and indispensable" activity, that plaintiffs provide security for the facility in other ways is of no moment.  Plaintiffs have not alleged that preventing the spread of COVID-19 is closely related to their principal activities.  It is the job of employees, who are being compensated, to screen the plaintiffs prior to their shift.  Plaintiffs are screened in an effort to prevent them from spreading the coronavirus, which is not an obligation specific to any particular entity or employer, but to society as a whole.  In response to the coronavirus pandemic many institutions, businesses, and other places where people assemble have implemented health screening procedures that were previously uncommon.  Society as a whole, including those screened, benefit from the screening.  Moreover, COVID-19 screening is a relatively recent activity, and plaintiffs were entirely able to perform their principal activities before the implementation of

COVID-19 screening, establishing that undergoing the screening is not a principal activity for which plaintiffs are employed.

In an analogous case, the United States Supreme Court held that security screenings were not "integral and indispensable" to warehouse employees and therefore not "work" under the FLSA. *See Busk*, 574 U.S. at 35; *see also Whalen*, 93 Fed. Cl. at 600-01 (finding that by undergoing a security inspection at a military base entrance and then traveling from the inspection site to one's worksite on base, workers were not engaged in compensable work activities). "Waiting in line" for such an inspection is also not a compensable activity. *Whalen*, 93 Fed. Cl. at 601 ("Plaintiffs are not entitled to compensation for time spent waiting in line at the gates to Edwards AFB."). Plaintiffs offer no facts suggesting that correctional officers would be any different in this regard with respect to COVID-19 screenings.

Plaintiffs fail to provide any facts demonstrating that COVID-19 screenings were intrinsic to their positions as correctional officers rather than a practice designed to satisfy a societal obligation that applies broadly. *See Whalen*, 93 Fed. Cl. at 600-01 (finding that security screening procedure that applied to everyone who entered a military base was not a work activity when employees underwent the screening). Preventing the spread of the coronavirus is not specific to any particular entity or employer, but applies to society as a whole.

After we revealed this flaw in plaintiffs' claim in our first motion to dismiss, plaintiffs attempted to resurrect their overtime claim for COVID-19 screening in their amended complaint by asserting that "the Department of Labor has issued regulations stating that medical examinations, like COVID-19 medical examination, constitutes time that should be paid by employers." ECF No. 10, ¶ 78 (citing 29 C.F.R. § 785.43). This regulation provides that "[t]ime spent by an employee in waiting for and receiving medical attention on the premises or at the

direction of the employer during the employee's normal working hours on days when he is

working constitutes hours worked."  29 C.F.R. § 785.43.

Plaintiffs, however, provide no support for their implicit assertion that taking an

employee's temperature and asking about symptoms, which does not require medical

qualification, is providing medical attention to plaintiffs.  Moreover, the Department of Labor

(DOL), which promulgated section 785.43, stated "that this section of regulations refers only to

work related illnesses and injuries."  *Medical Attention for Nonwork Injuries/Hours Worked*,

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Jan. 26, 1996).  "It is our opinion,

therefore, that time spent by your client's employees in obtaining medical attention on your

client's premises for nonwork related illnesses or injuries is not hours worked and not

compensable under FLSA."  *Id.*  Further, as plaintiffs allege, the screening does not occur during

plaintiffs' "normal working hours on days when he is working" as required by the regulation to

constitute "hours worked."  29 C.F.R. § 785.43.  And in any event, the DOL regulations are not

the regulations applicable to Federal employment.  29 U.S.C. § 204(f) ("Notwithstanding any

other provision of this chapter, or any other law, the Director of the Office of Personnel

Management is authorized to administer the provisions of this chapter with respect to any

individual employed by the United States.").

Plaintiffs also attempt to rely upon a DOL opinion letter that suggests that in certain

situations time spent undergoing a physical examination should be counted as hours worked.

ECF No. 10, ¶ 78 (citing DOL Wage and Hour Opinion Letter, Jan. 26, 1998).  This opinion

letter, however, takes up the issue of "time spent in drug and alcohol testing required of the

employee by the Department of Transportation" for pre-employment, post-accident, random,

reasonable suspicion testing, return-to-duty, and follow-up testing.  U.S. Dep't of Labor, Wage

& Hour Div., Opinion Letter, (Jan. 26, 1998).  Plaintiffs were not being tested for drugs and alcohol.  Moreover, the basis for this opinion is that "whenever an employer imposes special requirements or conditions that an employee must meet before commencing or continuing productive work, the time spent in fulfilling such special conditions is regarded as indispensable to the performance of the principal activity the employee is hired to perform.  Included in this general category are required physical exams and drug and alcohol testing."  *Id.*  Being free of COVID-19 is not a special requirement or condition imposed by the BOP.  Anyone suffering from COVID-19 should not go to work or anywhere near other people.  Also, again, plaintiffs provide no support for their implicit assertion that taking an employee's temperature and asking about symptoms is a physical exam.  Undergoing COVID-19 screening, therefore, is a preliminary activity and, as such, the time spent on it is not compensable.

With regard to the security screening, plaintiffs allege that "[w]hen plaintiffs and Class Members arrived at the prison centers, they were first required to undergo a security screening."  ECF No. 10, ¶ 40.  During the screening plaintiffs "emptied their pockets, emptied their bags, removed their shoes, removed their belts, removed their jackets, removed all metal objects, and submitted any personal items in their possession for inspection," "walked through a metal detector and underwent a further search if any metal objects were detected," "gather[ed] their belongings," and "put on their clothing, including their shoes, belts, and jackets."  *Id*. at ¶¶ 41-43.

Although plaintiffs assert that "[t]he security screenings were . . . necessary to the principal work performed by the Plaintiffs and Class Members – to provide security in the prisons and to search for contraband (ECF No. 10, ¶ 46), again such "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim."  *Bradley*, 136 F.3d at

1322.  Plaintiffs' conclusory allegation that eliminating the security screenings would impair their ability to do their work (*id.* at ¶ 49) also does not suffice to support its claim.

In fact, plaintiffs can still search for contraband and provide security without undergoing the security screening.  The purpose of this screening, as plaintiffs allege, is "to ensure that they did not inadvertently bring contraband or anything harmful into the facility" (ECF No. 10, ¶ 40), but preventing plaintiffs from bringing in contraband is not closely related to plaintiffs' principal activities.  Plaintiffs' principal activities involve monitoring the actions of others, while the security screening involves plaintiffs being monitored.

Plaintiffs allege that their principal work is "to provide security in the prisons" and that they undergo security screening "for purposes of overall safety in the prisons" (*id.* at ¶¶ 46-47), but the fact that plaintiffs help keep the facility safe by monitoring and supervising inmates does not make every aspect of facility safety part of their principal activities.  Everyone, including plaintiffs, are screened for the same reason as individuals entering a military base are screened.  That the security screening "shared the same purpose" of the work of the correctional officers (*id.* at ¶ 48), does not make the screening closely related and indispensable to the performance of plaintiffs' duties.  Plaintiffs being searched for contraband for security purposes is simply not "integral and indispensable" to plaintiffs searching inmates for contraband for security purposes.  Performing security screenings of plaintiffs, and others who will enter the facility, is the principal activity of those performing the screenings, not those undergoing the screenings.

Plaintiffs have not alleged that their principal activities includes preventing contraband from entering the prison.  In other words, plaintiffs do not allege that they were employed and should be compensated for their not bringing contraband into the prison facility.  Plaintiffs allege that they were hired to search for contraband, not to be searched for contraband.  *See*

17

*Busk*, 574 U.S. at 35 ("Integrity Staffing did not employ its workers to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment to Amazon customers.").  As stated above, the Supreme Court in *Busk* explicitly rejected the notion that in such cases security screenings are "integral and indispensable" and therefore "work" under the FLSA.  *See Busk*, 574 U.S. at 35.

Plaintiffs will likely ask the Court to adopt the Tenth Circuit's holding in *Aguilar v. Management & Training Corporation*, 948 F.3d 1270, 1279 (10th Cir. 2020) (concluding that "an officer cannot safely and effectively maintain 'custody and discipline of inmates' and 'provid[e] security' while also bringing weapons or contraband into the prison.").  This decision, of course, is not binding on the Court and is also not persuasive authority.  The U.S. District Court for the Northern District of Ohio correctly concluded that it "improperly applies *Busk*."  *Henderson v. Cuyahoga Cnty.*, 2020 WL 5706415, *3 (N.D. Ohio Sept. 24, 2020).

"[U]nder *Busk*, the correct analysis is whether the pre-shift screening here is an intrinsic element of the Plaintiff's principal activities and one which the employee cannot dispense if he is to perform his principal activities."  *Id.*  The district court logically decided that even if the pre-shift screening relates "to part of the activity Plaintiff performs during his shifts, *i.e.*, searching for contraband, the Plaintiff could still perform his job effectively if the pre-shift screenings were eliminated."  *Id.*  As in *Busk*, *Whalen*, and *Henderson*, the security screening at issue in the present case is "merely part of the ingress process Congress deemed to be preliminary," and, therefore, the time spent on it is not compensable.  *Henderson*, 2020 WL 5706415, *3.

        2.   Waiting In Line, Collecting Equipment, Walking To Post, And Exchanging Information Are Not Intrinsic Elements Of Plaintiffs' Principal Activities Or Are De Minimis

Under OPM's regulation "a preparatory or concluding activity is closely related to an

employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work." 5 C.F.R. § 551.412. "By implication, therefore, the agency is not obligated to pay overtime when this work takes ten minutes or less." *Carlsen*, 72 Fed. Cl. at 798.

Furthermore, "[t]he Federal Circuit has relied on factors other than the precise amount of time spent when considering whether an overtime claim is de minimis: '(1) the practical administrative difficulty of recording additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the work.'" *Id.* at 799 (quoting *Bobo*, 136 F.3d at 1468). The Court, therefore, must also consider these factors when determining whether the time spent by plaintiffs is de minimis.

Plaintiffs allege that they "have to wait in line at the equipment booth in the control center" to "collect their duty belts and other required equipment to perform their work for Defendant, including radios, handcuffs, pepper sprays, and keys." ECF No. 10, ¶¶ 52-53. Plaintiffs allege that "[t]he time it takes to wait in line, gather the equipment, and put on the equipment takes approximately 10-15 minutes" (*Id.* at ¶ 53), but they do not allege how much time each of these activities takes.

The alleged time it takes "waiting in line" at the equipment booth is not compensable under the FLSA. *See Whalen*, 93 Fed. Cl. at 601 ("The Supreme Court has described this waiting time to don protective gear as a 'preliminary' activity.") (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41 (2005)). "Gathering equipment" also logically fits into this category of "preliminary" activities. And plaintiffs' allegation that they "put on the equipment," including radios, handcuffs, pepper sprays, and keys, is readily distinguishable from the employees

19

donning "specialized protective gear" in cases such as *IBP*. *See, e.g.*, *IBP*, 546 U.S. at 30 ("All production workers . . . must wear outer garments, hardhats, hairnets, earplugs, gloves, sleeves, aprons, leggings, and boots" and many of them "must also wear a variety of protective equipment for their hands, arms, torso, and legs" including "chain link metal aprons, vests, plexiglass armguards, and special gloves."). Unlike the alleged equipment in the present case, "specialized protective gear" is worn for protection.

Plaintiffs' further allege that "[a]fter being assigned and donning their equipment, [they] continued to perform unpaid work while walking to their assigned posts inside the prisons." *Id.* at ¶ 60. Plaintiffs' walking to their post, however, is exempt from the FLSA. *Whalen*, 93 Fed. Cl. at 600 (citing 29 U.S.C. § 254(a)(1)).

With regard to exchanging information, plaintiffs allege that after they "arrived at their assigned posts, they were required by their supervisors to attend a pre-shift briefing with the correctional officers they were relieving." *Id.* at ¶ 61. Plaintiffs allege that they "discussed what occurred during the prior shift and the current proceedings at the facility. For example, if there are any inmates that may have behaved erratically during the prior shift, that information is disclosed to the incoming correctional officer. They also discussed any other security incidents, such as any fights or contraband issues." *Id.* at ¶ 61.

Plaintiffs allege that "[t]he time it takes to walk to the assigned post and attend the pre-shift briefing was approximately 10-15 minutes" (ECF No. 10, at ¶ 62), but they do not allege how much time is spent on each activity. "The inefficiency and administrative difficulty of isolating and recording [the time for the pre-shift exchange of information] is apparent." *Carlsen*, 72 Fed. Cl. at 799. The amount of time for exchanging information would need to be measured daily, because undoubtedly the amount of information to exchange, if any, varies by

day.  Plaintiffs allege that the exchange of information is required by their supervisors, and, therefore, what information is required to be exchanged by different supervisors may vary.  Any time spent exchanging non-required information would not be compensable work.  *See Battery Workers' Union Local 113 v. Elec. Storage Battery Co.*, 78 F. Supp. 947, 951-52 (E.D. Pa. 1948) (finding that an early relief practice practiced by fixed post guards was not compensable work time because it was voluntarily practiced by the guards and no practicable system could be adopted that would accurately reflect exact time of guards on post).  And any time spent discussing anything other than work would have to be subtracted.  *Carlsen*, 72 Fed. Cl. at 799.

The time-recording system would also have to account for the fact that some shift transfers would not involve the alleged exchange of information.  Plaintiffs allege that "[m]ost of the posts at the prison facilities are staffed for either 16 hours or 24 hours per day, although some may be staffed for only 8 hours a day."  ECF No. 10, ¶ 34.  A plaintiff staffing an 8 hour post, of course, does not exchange information before his or her shift.  "For the 16 hour post, there are two 8 hour shifts."  *Id.* at ¶ 35.  A plaintiff staffing the first 8 hour shift for a 16 hour post would similarly not exchange information before his or her shift.  Plaintiffs have not alleged what kind of post they staff or how much the exchange of information (and time waiting to pick up equipment) varies from day to day.  To the extent the Court decides that these specific facts are necessary to determine whether plaintiffs have stated a claim under the FLSA, plaintiffs' failure to allege them is grounds for dismissal.  *Iqbal*, 556 U.S. at 678.

Also, based on other allegations from plaintiffs, the Court can conclude that waiting in line, collecting equipment, walking to post, and exchanging information together take on average ten minutes a day.  Plaintiffs allege that "[t]o perform all of the necessary pre-shift work, [they] were required to arrive 30-45 minutes before the start of their scheduled shifts."  ECF No. 10, ¶

79.  This is an average of 37.5 minutes.  We demonstrated above that the COVID-19 screening and security screening are non-compensable preliminary activities.  Plaintiffs allege that COVID-19 screening takes 10 to 15 minutes (*id.* at ¶ 69), an average of 12.5 minutes and that security screening takes 10 to 20 minutes (*id.* at ¶ 44), an average of 15 minutes, for a combined average of 27.5 minutes for these preliminary activities.  Subtracting the preliminary activities average of 27.5 minutes (for COVID-19 screening and security screening) from the total pre-shift average of 37.5 minutes yields an average of 10 minutes for the remaining pre-shift activities (waiting in line, collecting equipment, walking to post, and exchanging information).

That on average it takes plaintiffs 10 minutes to wait in line, collect equipment, walk to post, and exchange information, combined with the analysis of these pre-shift activities above, establishes that these activities are either not intrinsic elements of plaintiff's principal activities or de minimis and thus non-compensable.

### 3. Exchanging Information, Walking Back To The Control Center, And Returning Equipment Are Also Not Intrinsic Elements Of Plaintiffs' Principal Activities Or Are De Minimis

Plaintiffs allege that "[a]t the end of their scheduled shifts, they were required to communicate with the incoming officer who was relieving them."  ECF No. 10, ¶ 85.  "[T]he incoming and outgoing officer discussed what transpired during the prior shift.  They discussed any problems with inmates, whether any fights had occurred, and other events during the prior shifts."  *Id.*  "Additionally, the outgoing officer was required to return his equipment at the Control Center."  *Id.* at ¶ 86.  "To do so, the correctional officer was required to walk from his post back to the Control Center."  *Id.*  Plaintiffs allege that "[t]he post shift work normally lasted 10-15 minutes" (*Id.* at ¶ 87), but they do not allege how much time each of these activities takes.

As with the pre-shift exchange of information, "[t]he inefficiency and administrative difficulty of isolating and recording [the time for the exchange of information] is apparent."

22

*Carlsen*, 72 Fed. Cl. at 799.  Moreover, plaintiffs allege that "one officer was paid at a given time" for the information exchange, "because there was not any overlap allocated for this [exchange of information] in the schedules for the officers."  ECF No. 10, ¶ 61.  Based on this allegation, the exchange of information for any given plaintiff is either a pre-shift activity or a post-shift activity, not both.

Plaintiffs do not allege whether the incoming officer or the outgoing is paid for the information exchange, but they allege that they "were required to be at their assigned posts, in uniform, with all assigned equipment, and ready to work by the start of their shift.  If they failed to do so and were late, they were subject to being disciplined."  *Id.* at ¶ 36.  And they make no allegation regarding the consequences of leaving one's post when relieved at the end of a shift without briefing the incoming officer.  Because there is more incentive for the incoming officer to arrive early than the outgoing officer to depart late, plaintiffs' allegations indicate that the briefing is apparently performed before the shift of the incoming officer and thus before the end of the shift for the outgoing officer.  The outgoing officer, therefore, is the one paid for the exchange of information and this alleged activity is a pre-shift activity.

Without a doubt, removing the time for the exchange of information from the 10-15 minutes alleged by plaintiffs for post-shift activities makes the remaining post-shift activities de minimis.  However, to the extent the Court decides that an allegation of the time it takes to return equipment or which officer is paid for the exchange of information is required to determine whether plaintiffs have stated a claim under the FLSA, plaintiffs' failure to allege these facts is grounds for dismissal.  *Iqbal*, 556 U.S. at 678.  Moreover, plaintiffs' walking from their post is exempt from the FLSA.  *Whalen*, 93 Fed. Cl. at 600 (citing 29 U.S.C. § 254(a)(1)).  And returning equipment is the post-shift equivalent of gathering equipment described above, and

thus a postliminary activity.  Accordingly, we respectfully request that the Court dismiss count one of the amended complaint.

IV.    <u>Plaintiffs Have Failed To State A Claim For Relief Under The Back Pay Act</u>

Plaintiffs assert that "pursuant to the Back Pay Act, 5 U.S.C. § 5596, [they] are entitled to recover interest" for their FLSA claim.  ECF No. 10, ¶ 114.  "The no-interest rule provides that sovereign immunity generally precludes a party from recovering interest in a suit against the United States."  *Arneson v. Callahan*, 128 F.3d 1243, 1245 (8th Cir. 1997).  "Congress may expressly waive the government's sovereign immunity from interest" (*id.*), but has not done so in this case.  The FLSA does not provide for prejudgment interest and the Back Pay Act (BPA) does not "unequivocally express Congress's intent to waive sovereign immunity under" the FLSA.  *Id.* at 1246 ("We hold that to provide the sovereign immunity wavier absent in Title VII, the separate statute must, at a minimum, unequivocally express Congress's intent to waive sovereign immunity under Title VII.").

Plaintiffs also assert that they are "entitled to recover their attorneys' fees and costs" pursuant to the FLSA and BPA.  Because "reasonable attorney's fee" and "costs of action" are allowed under the FLSA (29 U.S.C. ¶ 216(b)), the BPA claim is unnecessary.  Moreover, because plaintiffs' FLSA claim does not survive, BPA claim must also fail.  The BPA alone cannot confer jurisdiction in this court.  *See Refaei v. United States*, 129 Fed. Cl. 1, 23 (2016), *aff'd*, 725 F. App'x 945 (Fed. Cir. 2018) ("The Back Pay Act is not itself a jurisdictional statute. It is merely derivative in application, depending on a prior finding of appropriate jurisdiction in the Claims Court." (internal quotation marks omitted)).  Therefore, unless "some other provision of law commands payment of money to the employee for the 'unjustified or unwarranted personnel action,' the Back Pay Act is inapplicable."  *Id*. (internal quotation marks omitted).

Without the FLSA claim, there is no "other provision of law" that plaintiffs can rely on as a predicate for BPA relief.  Accordingly, plaintiffs' BPA claim must also be dismissed.

V.     Plaintiffs Have Failed To State A Claim For Declaratory Relief

        Plaintiffs also "seek a declaration as to the Parties' respective rights and requests that the Court declare that Defendant's conduct is illegal, as alleged in this Complaint, so that future controversies may be avoided and to direct Defendant to pay the Plaintiffs and Rule 23 Class Members all unpaid wages due and premium payments due during the class period."  ECF No. 10, ¶ 137.  Although plaintiffs request a declaratory judgment, they do not identify a legal basis for this relief.  ECF No. 10, at ¶¶ 135-37.

        This Court does not have jurisdiction to grant relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  *See United States v. King*, 395 U.S. 1, 5 (1969) (holding that the Declaratory Judgment Act does not vest the Court of Claims with the authority to issue declaratory relief); *Ghaffari v. United States*, 125 Fed. Cl. 665, 667 (2016) ("28 U.S.C. § 2202 expands on the authority granted in § 2201 . . . long-standing precedent establishes this court lacks jurisdiction to act under them . . . Any claims based on 28 U.S.C. §§ 2201 or 2202 are dismissed for lack of jurisdiction.").

        Under the Tucker Act, "[t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records."  28 U.S.C. § 1491(a)(2).  As we show above, plaintiffs have failed to state a claim for money damages under the FEPA or the FLSA. Plaintiffs claim for a declaratory judgment, therefore, must also fail.  Even if plaintiffs had stated a claim for a money judgment, a declaratory judgment under this provision of the Tucker Act

would not be necessary to afford plaintiffs complete relief.  Indeed, plaintiffs seek a declaratory

judgment not "as an incident of and collateral to," *id.*, a money judgment, but rather "so that

future controversies may be avoided."  ECF No. 10, ¶ 137.  This is another basis, therefore, for

dismissing count three of the amended complaint.

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court grant the defendant's

motion and dismiss plaintiff's amended complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR
Director

<u>s/ Reginald T. Blades, Jr.</u>
REGINALD T. BLADES, JR.
Assistant Director

<u>Of Counsel:</u>

<u>s/ David M. Kerr</u>
DAVID M. KERR
JOHN T. LeMASTER                         Trial Attorney
Senior Counsel                           Commercial Litigation Branch
Staff Training Academy                   Civil Division
1131 Chapel Crossing Rd, Bldg. 21        Department of Justice
Glynco, GA 31524                         P.O. Box 480, Ben Franklin Station
                                         Washington, D.C.  20044
                                         Telephone:  (202) 307-3390
                                         Facsimile:  (202) 514-8624
                                         Email:  David.M.Kerr@usdoj.gov

*Attorneys for Defendant*

January 27, 2021