# In the United States Court of Federal Claims

No. 20-1245C
(Filed: April 29, 2022)
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| LAURA MEDRANO, *et al.*, | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| THE UNITED STATES, | * |
|  | * |
| Defendant. | * |
|  | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Don J. Foty*, Hodges & Foty, LLP, Houston, TX, for Plaintiffs. With him on briefs were *David W. Hodges*, Hodges & Foty LLP, Houston, TX, and *Anthony J. Lazzaro*, The Lazzaro Law Firm, LLC, Moreland Hills, OH.

*David M. Kerr*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Martin F. Hockey, Jr.*, Acting Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as *John T. LeMaster*, Senior Counsel, Staff Training Academy, Glynco, GA.

## <u>OPINION AND ORDER</u>

Plaintiffs — current and former employees of the Federal Bureau of Prisons at various federal correctional facilities throughout the United States — seek overtime compensation under the Fair Labor Standards Act ("FLSA") and premium pay under the Federal Employees Pay Act ("FEPA"), plus related forms of relief, for allegedly compensable pre- and post-shift activities. Defendant's motion to dismiss is ripe for disposition.[1]

---

[1] Pls.' First Am. Collective Action & Class Action Compl. (ECF 10) ("Am. Compl."); Def.'s Mot. to Dismiss (ECF 15) ("Def.'s Mot."); Pls.' Resp. to Def.'s Mot. to Dismiss & in the Alternative, Mot. for Leave to Am. Compl. (ECF 21) ("Pls.' Resp."); Def.'s Reply in Supp. of its Mot. to Dismiss (ECF 23) ("Def.'s Reply"). In response to an order of the Court, the parties filed a joint status report withdrawing Plaintiffs' "claim for compensation for pre-shift health screening" and representing that "there are no legal or factual questions regarding the claims in this lawsuit that distinguish this case" from the

Although some aspects of the Amended Complaint fail as a matter of law — in particular, Plaintiffs' claims involving time spent in pre-shift security screenings and certain claims over which this Court lacks jurisdiction — the remainder sets out well-pleaded facts sufficient to state claims upon which relief can be granted. *See* RCFC 12(b)(6). The motion is therefore **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

In their Amended Complaint, Plaintiffs request backpay and liquidated damages under FLSA, as well as interest on their backpay under the Back Pay Act, *see* 5 U.S.C. § 5596, premium pay under FEPA, 5 U.S.C. § 5545,[2] attorneys' fees, and declaratory relief. Am. Compl. ¶¶ 108–15, 128–37, 149. The Amended Complaint alleges the following facts.

Plaintiffs are current or former correctional workers at federal prisons throughout the United States. Am. Compl. ¶¶ 7–24. Plaintiffs allege that their "primary job duty … was to manage and oversee the inmate population at the prison centers, to ensure safety at the prisons, and to maintain security at the prisons." *Id.* ¶ 39. To perform that duty, Plaintiffs allege that they "searched for contraband and provided security, count[ed], fe[d], and supervised detainees and inmates." *Id.*

Plaintiffs' workdays are organized into 8-hour shifts at assigned duty posts. *Id.* ¶ 34. "Most of the posts at the prison facilities are staffed for 16 or 24 hours per day, although some may be staffed for only 8 hours per day." *Id.* "There is no scheduled overlap" between 8-hour shifts. *Id.* ¶ 36. Plaintiffs allege that "because the scheduled shift is for 8 hours, Defendant only pays for 8 hours even if the correctional officer performs work lasting longer than 8 hours." *Id.* ¶ 34. Plaintiffs allege that various pre- and post-shift activities are unpaid. *See id.* ¶¶ 32, 38, 85.

The pre- and post-shift activities at issue include (1) pre-shift security screening,[3] (2) gathering and donning equipment, (3) walking to the assigned post and completing a pre-shift briefing with the outgoing officer(s), and (4) completing a post-shift briefing with the oncoming officer(s) and walking from the post to return

---

Court's recent decision in *Alkire v. United States*, No. 20-1654C, 2022 WL 575626 (Fed. Cl. Feb. 25, 2022). *See* Joint Status Report (ECF 31); Order (ECF 29). I therefore dispensed with oral argument.

[2] Because no FEPA claims were presented in *Alkire*, the parties' representation that "there are no legal or factual questions regarding the claims in this lawsuit that distinguish this case from *Alkire*" could be construed as abandoning Plaintiffs' FEPA claims. *See* Joint Status Report. The parties should clarify their position in the status report ordered below.

[3] The Amended Complaint seeks compensation for time spent in a pre-shift medical examination that the prisons have required since the outbreak of the COVID-19 pandemic. Am. Compl. ¶¶ 67–82. Plaintiffs have since abandoned that claim. *See* Joint Status Report.

equipment at the end of the day. I set out Plaintiffs' principal allegations concerning those activities in turn.

### 1. *Security Screening*

On arrival at their respective prisons, Plaintiffs must pass through a screening site in the prison's lobby and participate in a mandatory "security screening to ensure that they did not inadvertently bring contraband or anything harmful into the facility." *Id.* ¶ 40. Plaintiffs allege that undergoing the security screening was "necessary to the principal work" they performed, *i.e.*, "to provide security in the prisons and to search for contraband." *Id.* ¶¶ 46, 48; *see also id.* ¶ 47 ("Indeed, Defendant required the Plaintiffs … to undergo this screening for the purposes of overall safety in the prison and to prevent the officers from inadvertently or intentionally bringing contraband into the prison centers."). If security screenings were dispensed with, Plaintiffs allege, "officers could inadvertently or intentionally bring weapons or other contraband into the prison … result[ing] in … a less secure prison and … impair[ing] the officers' ability to provide security, supervise the inmates/detainees, and search for contraband." *Id.* ¶ 49. Plaintiffs allege that it took them on average "10–20 minutes per day" to clear the security screening. *Id.* ¶ 44.

### 2. *Waiting in Line, Gathering Equipment, and Donning Equipment*

Once through security, Plaintiffs must "collect their duty belts and other required equipment to perform their work for Defendant, including radios, handcuffs, pepper sprays, and keys." *Id.* ¶ 52. The Plaintiffs "gather this equipment from the equipment booth located in the [C]ontrol [C]enter." *Id.* According to Plaintiffs, collecting and donning the equipment is essential to their work of ensuring "the overall safety of the prison[s]," *id.* at ¶ 56, because the equipment is necessary for them to do their jobs, *id.* ¶ 57. Plaintiffs allege that they can only gather and don their equipment after the security screening "because the Plaintiffs … cannot bring this equipment into the facility, cannot clear the metal detector while wearing the equipment, and th[e] equipment is in the possession of the Defendant to ensure that all needed equipment for the safety and security of the prisons is properly maintained." *Id.* at ¶ 52. Plaintiffs allege that "[t]he time it takes to wait in line, gather the equipment, and put on the equipment" is "approximately 10–15 minutes." *Id.* ¶ 53.

### 3. *Walking to the Assigned Post and Completing a Pre-Shift Briefing*

"After being assigned and donning their equipment," Plaintiffs may then walk to their posts. *Id.* ¶ 60. While on the way to their posts, "Plaintiffs … have to remain vigilant at all times, observe and correct inmate behavior, respond to any security breaches, and identify any safety issues." *Id.* And "[i]f an alarm sounds while …

walking to their posts," Plaintiffs "have to immediately respond to the emergency." *Id.*

Once at their duty posts, Plaintiffs are "required by their supervisors to attend a pre-shift briefing with the correctional officers they [are] relieving." *Id.* ¶ 61. The outgoing officers tell the incoming officer about any significant "security incidents" or concerns from the prior shift and "current proceedings at the facility." *Id.* Plaintiffs allege that it took "approximately 10–15 minutes" to walk to their posts and complete the pre-shift briefing. *Id.* ¶ 62.

### 4. *Post-Shift Activities*

Plaintiffs lastly allege that they perform some of the same activities, also without compensation, when their shifts end. Plaintiffs allegedly must conduct a security briefing "with the incoming officer who [relieves] them," "walk from [their] post[s] back to the Control Center," and "return [their] equipment at the Control Center." *Id.* ¶¶ 85–86. While completing these activities, "Plaintiffs … were required to remain vigilant at all times, observe and correct inmate behavior, respond to any security breaches, and identify any safety issues." *Id.* ¶ 86. "If an alarm sounded … while walking to the Control Center," Plaintiffs "were required to immediately respond to the emergency." *Id.* Plaintiffs allege that these activities typically took "10–15 minutes." *Id.* ¶ 87.

## DISCUSSION

## I. Jurisdiction

The United States Court of Federal Claims has jurisdiction under the Tucker Act to adjudicate "any claim against the United States founded … upon … any Act of Congress or any regulation of an executive department … in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act is "a jurisdictional statute [that] does not create any substantive right enforceable against the United States for money damages," *United States v. Testan*, 424 U.S. 392, 398 (1976) (citing *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605–07 (1967)), parties asserting Tucker Act jurisdiction must "identify a substantive right for money damages against the United States, separate from the Tucker Act itself." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). That requires a "money-mandating" source of law, *i.e.*, a statute or regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained and is reasonably amenable to the reading that it mandates a right of recovery in damages." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (quotes and citations omitted) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)).

Plaintiffs' claims for uncompensated work time arise under FLSA, which is a money-mandating source of law. *See Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014).[4] Because Plaintiffs are government employees seeking backpay and related relief under FLSA, they have standing to raise those claims. Am. Compl. ¶¶ 3, 113, 149.

"[T]he special statute of limitations governing the Court of Federal Claims requires" that timeliness be considered a jurisdictional question, calling for "*sua sponte* consideration." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008). FLSA claims must be brought within two years of alleged violations, or within three years if the violations were willful. 29 U.S.C. § 255(a). Plaintiffs appear to claim that the challenged pay practices were in effect through the date the Amended Complaint was filed. Am. Compl. ¶¶ 2, 25–26, 32. Some of the Plaintiffs were allegedly employed by Defendant when the Amended Complaint was filed, and so have claims that accrued within the statute of limitations. *Id.* ¶¶ 2, 7–8; 11; 18; 20; 24–26; 32; Pls.' Resp. at 1–2.[5] At least some of Plaintiffs' claims therefore appear to be timely.[6]

## II. Merits

### A. Legal Standards

Under FLSA, employees are entitled to compensation for hours worked, including work "suffer[ed] or permit[ted]" by their employer. *See* 29 U.S.C. §§ 203(g), 207(a)(1); *see also* 5 C.F.R. § 551.401(a). The Portal-to-Portal Act clarifies that compensable hours do not include travel and other "activities which are preliminary to or postliminary to [the employee's] principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). But if an employee performs his principal activities, including tasks integral and indispensable to his work, before or after his shift — and if the time he spends is more than *de minimis* —

---

[4] Jurisdiction over Plaintiffs' allegations related to the Back Pay Act and Declaratory Judgment Act is discussed below.

[5] Almost all Plaintiffs appear to have been employed by Defendant in the two years prior to the filing of the Amended Complaint. *See* Am. Compl. ¶¶ 7–9, 11–13, 15–22, 24. *But see id.* ¶¶ 10, 14, 23 (employed in the three years prior to the filing).

[6] Each Plaintiff has pleaded employment dates consistent with the statute of limitations. Defendant has not challenged the individual standing of any Plaintiff or the timing of any individual Plaintiff's claims. Each Plaintiff must, of course, personally establish jurisdiction in order to prevail on the merits. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[Standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

compensation is generally required.[7] The question is thus whether Plaintiffs have adequately pleaded that the various ways they allegedly spend time before reaching and after leaving their duty posts are (1) part of their principal activities, and (2) more than *de minimis*.

I consider that question under the familiar standards of RCFC 8 and 12(b)(6), which are modeled on the analogous Federal Rules of Civil Procedure.[8] A complaint in this Court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" RCFC 8(a)(2). The allegations need not be "detailed," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), but must be "sufficient …, [when] accepted as true, to 'state a claim to relief that is plausible on its face,'" *id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court considers whether to make that inference in light of "its judicial experience and common sense." *Id.* at 679.

The inference must be stronger than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. But the inference does not need to be *probable*. Rather, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is *im*probable." *Twombly*, 550 U.S. at 556 (emphasis added). Any facts — as distinct from legal conclusions — pleaded in a complaint must be "accepted as true." *Iqbal*, 556 U.S. at 678. The court "must draw all reasonable inferences in favor of the claimant." *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1354 (Fed. Cir. 2017) (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)). And "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of

---

[7] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005) (itself quoting *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956))); *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998); 5 C.F.R. § 551.412(a)(1) (requiring compensation for activities taking more than ten minutes per workday that are "closely related to an employee's principal activities, and … indispensable to the performance of the principal activities"). The regulation, it should be noted, diverges slightly from the Supreme Court's formulation by substituting the phrase "closely related" for "integral." *Compare* 5 C.F.R. § 551.412(a)(1), *with Integrity Staffing*, 574 U.S. at 33. *Integrity Staffing* appears to address the relationship between "closely related" and "integral" by quoting a DOL interpretation of the Portal-to-Portal Act: "Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance." 574 U.S. at 35 (quoting 29 C.F.R. §790.8(c)). Here, the parties have not suggested that those terms mean different things. Because the "integral and indispensable" test is the Supreme Court's gloss on the Portal-to-Portal Act, the regulation might be in conflict with the statute if it means something different. I will therefore assume that the regulation's standard is identical to what the Supreme Court has derived from the Portal-to-Portal Act.

[8] *Kraft, Inc. v. United States*, 85 F.3d 602, 605 n.6 (Fed. Cir.) ("The precedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims."), *modified on denial of reh'g*, 96 F.3d 1428 (Fed. Cir. 1996).

a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoted in *Twombly*, 550 U.S. at 556).[9]

## B. Plaintiffs' "Principal Activities"

Plaintiffs, again, are entitled to compensation for their work, a term that includes the principal activities they are "employed to perform," *see* 29 U.S.C. § 254(a)(1), plus "all activities which are an 'integral and indispensable part of the principal activities.'" *Integrity Staffing*, 574 U.S. at 33 (quoting *IBP*, 546 U.S. at 29–30). The first step is to define Plaintiffs' principal activities, as set out in Plaintiffs' factual allegations.[10] *Alkire*, 2022 WL 575626, at *5.

An activity is integral and indispensable to the employee's principal activities — and thus *part* of the principal activities, *see IBP,* 546 U.S. at 29–30, 33 — "if it is an intrinsic element of those activities [*i.e.*, integral] and one with which the employee cannot dispense if he is to perform his principal activities [*i.e.*, indispensable]." *Integrity Staffing*, 574 U.S. at 33. To meet that test, it is not enough that a given activity is required by the employer or done for the employer's benefit. *Id.* at 36. Rather, the question is whether the activities are "tied to" — that is, integral and indispensable to — "the productive work that the employee is *employed to perform*." *Id.* (emphasis in original).

A few examples illustrate the "integral and indispensable" test. On the one hand, time meatpackers spend on knife-sharpening is integral and indispensable to

---

[9] Plaintiffs, in addition to citing *Twombly* and *Iqbal*, cite an older case for the proposition that "a court 'should not dismiss a complaint for failure to state a claim unless it is *beyond doubt* that the plaintiff can prove *no set of facts* which would entitle him to relief.'" Pls.' Resp. at 4–5 (quoting *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)) (emphasis in original). That is not the correct standard. The language Plaintiffs quote, which originates in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), is "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

[10] What Plaintiffs do during their day is a factual matter, and allegations on the subject are presumed true. The *significance* of what Plaintiffs do — *i.e.*, whether given functions are part of Plaintiffs' principal activities — is a legal question. *See Ballou v. Gen. Elec. Co.*, 433 F.2d 109, 111 (1st Cir. 1970) ("[T]he issue whether or not the classroom program was an 'integral and indispensable part' of appellants' principal activity is not, as appellants suggest, a factual one. It is a question of law."); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004) ("The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law.") (citing *Baker v. Barnard Const. Co.*, 146 F.3d 1214, 1216 (10th Cir. 1998); *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1349 (M.D. Al. 2009) ("Whether a particular activity is integral and indispensable under the FLSA is a question of law[.]") (citing *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992)); *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1371 (S.D. Ga. 2015) (citing *Anderson*, 604 F. Supp. 2d at 1349). No presumption of truth applies to Plaintiffs' legal positions, *Iqbal*, 556 U.S. at 678, even when "couched as" allegations of fact. *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

their work, because without it they could not cut meat safely and efficiently. *Id.* at 34 (citing *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956)). Time battery plant employees spend "showering and changing clothes" to protect themselves against chemicals that are "toxic to human beings" is integral and indispensable to their work as well: Poisoned employees cannot do their jobs. *Id.* (quoting *Steiner*, 350 U.S. at 249). On the other hand, time spent *waiting* to don protective gear is "two steps removed from the productive activity," and therefore not integral and indispensable. *IBP*, 546 U.S. at 42. Most relevant to this case, the Supreme Court has also excluded time warehouse employees spend being screened for theft after their shifts: The employees' principal activity was not "to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment," and "[t]he security screenings … were not 'integral and indispensable' to the employees' duties[.]" *Integrity Staffing*, 574 U.S. at 35.

Here, Plaintiffs' principal activity is "to manage and oversee the inmate population at the prison centers, to ensure safety at the prisons, and to maintain security at the prisons." Am. Compl. ¶ 39; *see* Pls.' Resp. at 1 (stating that their "principal activity" was "ensuring [the] safety and security of the prisons and inmates"). They allege that they "were responsible for the custody and discipline of inmates and detainees held" at the facilities. Am. Compl. ¶ 39. Plaintiffs also allege that they have other duties such as "search[ing] for contraband … [and] count[ing], feed[ing], and supervis[ing] detainees," *id.*, "remain[ing] vigilant at all times, observ[ing] and correct[ing] inmate behavior, respond[ing] to any security breaches, and identify[ing] any safety issues," *id.* ¶ 60. That Plaintiffs' principal activity involves those responsibilities is a factual allegation entitled to the presumption of truth.

**C. FLSA Claim**

Given that the Amended Complaint adequately defines Plaintiffs' principal activities, the next question is whether it permits a reasonable inference that the allegedly uncompensated functions at issue are part of those activities and more than *de minimis*. *Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011).[11] I consider the job functions one at a time.

---

[11] Plaintiffs argue that the "continuous workday rule" requires compensation for all time between their first and last principal activity in a given workday. Am. Compl. ¶¶ 83–84; Pls.' Resp. 19–20, 24; *see* 29 C.F.R. § 790.6(b). As I have previously noted, the continuous workday rule does not apply to federal employees in the same way that it does to other workers. *Bridges v. United States*, 156 Fed. Cl. 129, 134 (2021), *appeal filed*, No. 22-1140 (Fed. Cir. Nov. 10, 2021). But there is no need to address how the continuous workday rule applies in this case because doing so will require facts that have not yet been developed.

1. *Security Screening*

The first activity at issue is the security screening Plaintiffs undergo when they arrive at work. Although the issue is complicated, I conclude that they have not stated a plausible claim for compensation for that time.

The security screenings are not the "principal activity or activities which [Plaintiffs are] employed to perform." 29 U.S.C. § 254(a)(1). Much like the employees in *Integrity Staffing*, Plaintiffs are not "employ[ed] … to undergo security screenings," but to maintain security once inside the prisons. 574 U.S. at 35. There is nothing "productive" about the security screenings. *Id.* at 36.

Nor are security screenings integral or indispensable to Plaintiffs' work, as the Supreme Court has defined the Portal-to-Portal Act standard.[12] One consequence of the integral and indispensable test is to separate "activities that are essentially part of the ingress and egress process" from "activities that constitute the actual 'work of consequence performed for an employer[.]'" *Id.* at 38 (Sotomayor, J., concurring) (quoting 29 C.F.R. § 790.8(a)). Pre-shift security screenings, like post-shift screenings for employee theft and other arrival and departure processes, "fall on the 'preliminary or postliminary' side of this line." *Id.* at 38–39 (alteration omitted).

The Amended Complaint gives no basis for a plausible inference that a security screening is an "intrinsic element" of (*i.e.,* integral to) maintaining security inside the prisons any more than the screening in *Integrity Staffing* was an intrinsic element of handling products inside a warehouse. *Searching* for contraband is allegedly one of Plaintiffs' job duties. Am. Compl. ¶¶ 39, 46. And the security screenings allegedly "prevented weapons and other contraband from entering the prison[s]." Am. Compl. ¶ 48. I take those allegations as true, as I must. But it does not follow that *being screened* to ensure compliance with contraband rules is an intrinsic part of Plaintiffs' job.

On the contrary: Just as a theft screening is "not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment," *Integrity Staffing*, 574 U.S. at 35, Plaintiffs can search for contraband even if they themselves are not screened. The acts are distinct in every way. They are certainly not related in the way that having a sharp knife is part and parcel of cutting meat, *King Packing*, 350 U.S. at 262, or that handling dangerous chemicals entails changing clothes and showering, *Steiner*, 350 U.S. at 249–50. The screening — like other kinds of waiting time before or after shifts — is therefore "two steps removed"

---

[12] "As explained above, an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Integrity Staffing*, 574 U.S. at 35.

from the activities the employees are employed to perform. *IBP*, 546 U.S. at 42. That means the work and the screening are not "intrinsic" to each other. *See Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring) (observing that screenings were not principal activities even though they "in some way related to the work that the employees performed").

For similar reasons, Plaintiffs' screenings are not "indispensable" to their work because they are not activities "with which the employee cannot dispense if he is to perform those activities." *Id.* at 35 (majority opinion). Plaintiffs emphasize the importance of preventing contraband from entering the prisons to ensure the prisons' security and argue on that basis that contraband screenings are part of their principal activities. Am. Compl. ¶¶ 48–49. But even taking that allegation as true, it is not the *screening* that makes it possible for Plaintiffs to do their jobs, but following prison rules that forbid contraband.

Suppose two prison employees came to work at the same duty post on the same day, neither one carrying contraband. Even if one was screened and the other was not, nothing in the Amended Complaint suggests they could not perform their own duties equally well. Or suppose two hypothetical prisons, one of which screened all its employees and one of which did not. The safety and effectiveness of the employees inside the prison would depend on whether they introduced contraband, not on whether they were screened. Precisely the same was true in *Integrity Staffing*: Assuming warehouse employees refrained from stealing, whether they were screened or not at the end of their shifts makes no difference in whether they could do their jobs. The only inference is that like in *Integrity Staffing*, the prisons "could have eliminated the screenings altogether without impairing the employees' ability to complete their work." 574 U.S. at 35.[13]

There is no interpretation of Plaintiffs' pleadings that avoids *Integrity Staffing*. One way to construe Plaintiffs' allegations is that a prison employee *who introduces contraband into the prison* cannot safely do his job. Or perhaps Plaintiffs mean that an employee cannot do his job if *other* employees have introduced contraband. Either way, I take the allegation as true. But it is equally obvious that the employees in *Integrity Staffing* could not have done their work of "retrieving products from warehouse shelves or packaging them for shipment" if they (or their colleagues) were

---

[13] That also distinguishes this case from *King Packing* and *Steiner*. A meatpacker can cut meat if he sharpens his knives, but not if he fails to do so. *King Packing*, 350 U.S. at 262 ("[A] knife to be of any practical value in a knife job has to be sharp.") (quotes and alteration omitted). A battery plant employee can work if he changes his clothing and showers, but not if he is poisoned by lead and burned by sulphuric acid. *Steiner*, 350 U.S. at 248–50. In both cases, the specific use of time at issue was what made the work possible.

stealing the products instead. 574 U.S. at 35. If that were enough to render a screening indispensable, *Integrity Staffing* would have allowed the employees' claims to proceed.

Yet another construction of the Amended Complaint is that excluding contraband is essential to prison management. Perhaps the prison could not be managed unless Plaintiffs are not only prohibited from bringing contraband but screened at entry. I take that allegation as true too. But even then, it is still irrelevant to the *Integrity Staffing* test, which focuses solely on indispensability to "*the employee.*" *Id.* (emphasis added). A warehouse, after all, could not function if its employees walked off with the merchandise. That is presumably why the employer in *Integrity Staffing* required post-shift screening. Just so here: The *prisons* may not be able to dispense with screenings — as opposed to only written policies on contraband — but nothing in the Amended Complaint suggests that *Plaintiffs* cannot.

What *Integrity Staffing* suggests, in other words, is a distinction between an employee's principal activities, the rules the employee must follow at work, and the processes the employer puts in place to enforce compliance with the rules — particularly at ingress and egress.[14] An employee might have to follow a rule at work, and the compliance measures might be required by the employer, *see Integrity Staffing*, 574 U.S. at 36, but it does not follow that the measures are indispensable to the employee's principal activities. Once again, compliance measures are "two steps removed" from the work. *IBP*, 546 U.S. at 42.

The foregoing interpretation of *Integrity Staffing* tallies with the Court's reliance on a Department of Labor ("DOL") opinion letter concluding that a pre-shift search at a rocket-powder plant for "matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees" was not compensable. *See Integrity Staffing*, 574 U.S. at 35–36 (quoting Opinion Letter from Dept. of Labor, Wage and Hour Div., to Dept. of Army, Office of Chief of Ordnance (Apr. 18, 1951), pp. 1–2). If a pre-shift search for prohibited fire-starters at an explosives factory is not integral or indispensable to those employees'

---

[14] *See Sanford v. Preferred Staffing Inc.*, 447 F. Supp. 3d 752, 756 (E.D. Wis. 2020) ("Plaintiffs contend that the preliminary processes required by the Staffing Defendants are indeed integral to the principal activities they were hired to perform. … Plaintiffs' view again conflates the requirements an employer imposes upon its employees with the actual work the employees are meant to perform."); *Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37, 40 (D.D.C. 2015) ("Plaintiffs argue that they have 'established that the Class members' uniform maintenance activities were part of their principal work duties because their job descriptions required compliance with Defendants' dress and appearance, patient safety and inflectional control policies.' However, a requirement to comply with these several policies is not enough to establish uniform maintenance as a principal work activity. An activity is only compensable as a principal activity if the employee is 'employed to perform' that activity.") (footnote and citation omitted) (quoting *Integrity Staffing*, 574 U.S. at 34).

principal activities, it is hard to imagine why a search for contraband at a prison would be: Both searches are directed at excluding items that would be dangerous in the workplace.

It also tallies with the bulk of authority holding as a matter of law (either at the pleadings or at summary judgment) that pre-shift security screenings generally are not compensable. *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592–93 (2d. Cir. 2007) (pleadings); *Bonilla v. Baker Concrete Construction, Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007) (summary judgment); *Whalen v. United States*, 93 Fed. Cl. 579, 600 (2010) (summary judgment); *Henderson v. Cuyahoga Cty.*, No. 1:20-CV-1351, 2020 WL 5706415, at *3 (N.D. Ohio Sept. 24, 2020) (pleadings); *Cinadr v. KBR, Inc.*, No. 3:11-CV-00010, 2013 WL 12097950, at *7 (S.D. Iowa Feb. 15, 2013) (summary judgment); *Ceja-Corona v. CVS Pharmacy, Inc.*, No. 1:12-CV-01868, 2013 WL 796649, at *9 (E.D. Cal. Mar. 4) (pleadings), *on reconsideration in part*, No. 1:12-CV-01868, 2013 WL 3282974 (E.D. Cal. July 2, 2013); *Jones v. Best Buy Co.*, No. CV-12-95, 2012 WL 13054831, at *2–3 (D. Minn. Apr. 12, 2012) (pleadings); *Phillips v. Washington Grp. Int'l, Inc.*, No. 1:09-CV-00431, 2010 WL 11561237, at *5 (N.D. Ala. Sept. 29, 2010) (summary judgment); *Anderson*, 604 F. Supp. 2d at 1359 (summary judgment); *Sleiman v. DHL Express*, No. CIV.A. 09-0414, 2009 WL 1152187, at *4–5 (E.D. Pa. Apr. 27, 2009) (pleadings). *But see Fritz v. Corizon Health, Inc.*, No. 6:19-CV-03365, 2020 WL 9215899, at *9 (W.D. Mo. Jan. 31, 2020) (declining to dismiss claims involving security screening for state prison nurses).

Plaintiffs' principal contrary authority, *Aguilar v. Management & Training Corp.*, is against the weight of caselaw.[15] 948 F.3d 1270 (10th Cir. 2020). It is also wrongly decided. In that case, the Tenth Circuit held that a pre-shift security screening for prison employees was part of the employees' principal activities because "the security screening and the officers' work share the same purpose" and because the screening was "tied to" the employees' work. *Id.* at 1278 (quoting *Integrity Staffing*, 574 U.S. at 36).

That test is incorrect. The question is not whether pre-shift activities align with the "purpose" of employment. If it were, then virtually every pre- and post-shift activity required by an employer would be compensable. Why would an employer mandate a given activity in the first place if not to further the "purpose" of

---

[15] Plaintiffs have also submitted, as supplemental authority, four recent decisions by this Court denying motions to dismiss similar complaints. Pls.' Mot. for Leave to File Notice of Suppl. Auth. (ECF 28) (*Alvarez v. United States*, No. 20-1533C, 2021 WL 6163405 (Fed. Cl. Dec. 30, 2021); *Adair v. United States*, No. 20-1148C, 2021 WL 6163407 (Fed. Cl. Dec. 30, 2021); *Alexander v. United States*, No. 21-1143C, 2021 WL 5045270 (Fed. Cl. Oct. 30, 2021); and *Adegbite v. United States*, No. 20-1183C, 2021 WL 5045268 (Fed. Cl. Oct. 29, 2021)). Although I generally agree with those decisions, I respectfully part from my learned colleagues on the issue of security screenings.

employment? *Integrity Staffing* rejects that approach: "If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address." 574 U.S. at 36.[16]

Nor is it enough for an activity to be "tied to" the employee's work. *Aguilar*, 948 F.3d at 1278. The Tenth Circuit took that test from *Integrity Staffing*'s reference to activities "tied to the productive work that the employee is employed to perform." 574 U.S. at 36. But it appears to have read the *Integrity Staffing* Court's language in isolation, not in the context of a detailed explanation of what it *means* for pre- or post-shift activity to be part of the employee's principal activities. Far from merely directing lower courts to analyze in the abstract whether an activity is "tied to" an employee's principal activities, the Court requires analyzing whether the activity is integral and indispensable — a more focused analysis, rooted in the words of the Portal-to-Portal Act. The Supreme Court's reasoning precludes the vague, atextual search for relatedness that the *Aguilar* court used. *See id.* at 33; *see also id.* at 38 (Sotomayor, J., concurring).

By asking the wrong questions, the *Aguilar* court reached the wrong answers. The Tenth Circuit held that the screenings were "'an intrinsic element of' the officers' security work" because "the security screening and the officers' work share the same goal," *Aguilar*, 948 F.3d at 1279 (quoting *Integrity Staffing*, 574 U.S. at 33) — a mistaken test that conflates the employer's purposes with the employee's principal activities. The court also concluded that the screenings were "indispensable" because "an officer cannot safely and effectively maintain custody and discipline of inmates and provide security while also bringing weapons or contraband into the prison," *id.* (quotes and alterations omitted) — which, as explained above, confuses the employee's principal activities with the compliance measures the employer chooses to implement.

The *Aguilar* court distinguished the DOL letter, relied on in *Integrity Staffing*, that decided against compensability for pre-shift safety screening at the rocket-powder plant. The basis for the distinction appears to be that while there is no "clear or obvious connection" between a screening for fire-starters and "the particular

---

[16] That does not necessarily mean I must *ignore* the purpose of employment. Identifying an employee's "principal activities" and their relationship to other activities presumably entails understanding what ends his employment is supposed to serve — much like interpreting statutory terms might depend on knowing the statute's subject matter or the problem the statute is supposed to solve. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012); Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021). The employer's purpose, however, is not an analytical substitute for the employee's actual work tasks any more than a statute's purpose displaces its text.

activities … employees [were] employed to perform" at the rocket-powder plant, there *is* such a connection between screening for contraband at a prison and the activities of prison employees. *Aguilar*, 948 F.3d at 1278. That is a stretch at best. Although the *Integrity Staffing* Court did not "clearly outline[] the principal activities of the employees at the rocket-powder plant," *id*., a faithful reading of the opinion should not place much weight on the Court leaving it implicit that fire-starters could lead to explosions that plant employees are presumably responsible for avoiding. The fact that the Supreme Court analogized so readily from the rocket-powder plant to the warehouse — where the Court *did* define employees' principal activities, *see Integrity Staffing*, 574 U.S. at 35 — suggests that the kind of detail the Tenth Circuit apparently expected was unnecessary for the Supreme Court's reasoning.

Plaintiffs also argue that the pre-shift security screenings are compensable because "the Government derives the primary benefit from having … secure prison[s], with compliant inmates, and no violent activity" and "the Plaintiffs ha[ve] no choice in whether to complete the security screening." Pls.' Resp. at 13–14. This argument ignores the holding of *Integrity Staffing* that a given activity being required by the employer or done for the employer's benefit does not make it "integral and indispensable." *Integrity Staffing*, 574 U.S. at 36.

Ordinarily, even weak claims should be tested through discovery if they meet pleading standards. *See, e.g.*, *Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (quotes omitted); *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016). But *Integrity Staffing* itself was decided on a motion to dismiss — indeed, it overturned a Ninth Circuit decision reversing the district court's grant of dismissal. 574 U.S. at 37; *Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 530–31 (9th Cir. 2013). It therefore follows that the relationship between screenings and an employee's principal activities is best determined as a matter of law when the pleadings allow. In this case, there are no facts consistent with the pleadings that Plaintiffs might adduce to show that undergoing screening is part of their productive work, or that screening itself is integral and indispensable to that work. *See Twombly*, 550 U.S. at 563. Even if Plaintiffs proved that excluding contraband is essential to prison administration and that they cannot do their jobs if contraband were inside, we would end up right back where we are, asking whether time spent in screenings is integral and indispensable to Plaintiffs' work — a *legal* question which must be answered in the negative. *See Rowe v. United States*, 151 Fed. Cl. 268, 271 (2020) ("It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) 'when the facts asserted by the claimant do

not entitle him to a legal remedy.'") (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)), *appeal filed*, No. 21-2017 (Fed. Cir. June 3, 2021).

    2. *Waiting in Line, Gathering Equipment, and Donning Equipment*

    The second activity at issue, which Plaintiffs allege they perform as soon as they pass through security, is "wait[ing] in line at the equipment booth in the [C]ontrol [C]enter," gathering their equipment, and donning a security belt and other gear. Am. Compl. ¶¶ 52–53. I conclude that Plaintiffs have stated a claim for relief for that time.

    Defendant argues that the time Plaintiffs spend "waiting in line" and "gathering equipment" are not compensable under FLSA because they are both preliminary activities. Def.'s Mot. at 19. Defendant is, of course, correct that time spent waiting to don gear is often noncompensable, as it is "two steps removed from the productive activity." *IBP*, 546 U.S. at 42. But it does not necessarily follow that "gathering" equipment before donning it is equivalent to waiting in line, let alone at the pleadings stage. *See In re Cargill Meat Sols. Wage & Hour Litig.*, 632 F. Supp. 2d 368, 378 (M.D. Pa. 2008) (holding that "time Plaintiffs spent donning [and] gathering … work-related gear and equipment … is compensable under the FLSA"). And even if waiting in line and gathering equipment are both noncompensable, it is not clear how much time they consume in the 10–15 minutes it allegedly takes to "wait in line, gather the equipment, and put on the equipment[.]" Am. Compl. ¶ 53. Given that I must permit Plaintiffs to proceed if a reasonable inference of liability arises from the pleadings, *Iqbal*, 556 U.S. at 678; *see United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006), it would not be appropriate to define at this stage what portion of Plaintiffs' donning time is compensable.

    Defendant also argues more broadly that time associated with donning is noncompensable because Plaintiffs' equipment is not "'specialized protective gear' … worn for protection." Def.'s Mot. at 19–20 (quoting *IBP*, 546 U.S. at 30); *see* Def.'s Reply at 11–12 (citing *Gorman*, 488 F.3d at 594, and *Corman v. JWS of New Mexico, Inc.*, 356 F. Supp. 3d 1148, 1183 (D.N.M. 2018)). The Supreme Court has contrasted "the donning and doffing of specialized protective gear," which can be compensable time, *see IBP*, 546 U.S. at 30, with activities analogous to "changing clothes and showering under normal conditions," which is not, *see Steiner*, 350 U.S. at 249. Some courts have accordingly distinguished between "special protective gear," *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994), and "generic protective gear," like "a helmet, safety glasses and steel-toed boots," *Gorman*, 488 F.3d at 594; *see Reich*, 38 F.3d at 1125. Here, Plaintiffs allege that their equipment includes "radios, handcuffs, pepper sprays, and keys," Am. Compl. ¶ 52, and that donning the equipment is necessary for

their work, *id.* ¶ 55. The materials Plaintiffs mention might plausibly be specialized rather than generic, and so time spent donning them may be compensable.[17] There is no way to resolve that question on the pleadings, which must be interpreted in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678; *United Pac. Ins.*, 464 F.3d at 1327–28. Whatever the exact standard might be for determining the compensability of time spent donning different kinds of equipment, applying it will require facts.

### 3. *Walking to and from the Assigned Post, and Completing Pre-Shift and Post-Shift Briefings*

The next segment of Plaintiffs' claims involves the time they spend walking from the Control Center to their duty posts to commence their shifts, Am. Compl. ¶ 60, and walking to the Control Center from their duty posts at the end of their shifts to return their equipment, *id.* ¶ 86. Plaintiffs have stated a plausible claim for relief as to that time.

Simply walking from a check-in location to a workstation is expressly excluded from compensation under the Portal-to-Portal Act. 29 U.S.C. § 254(a)(1); *IBP*, 546 U.S. at 40–41. But Plaintiffs allege that when they walk from the Control Center to their duty posts, they are not just covering distance, but "correct[ing] inmate behavior," "respond[ing] to any security breaches," "identify[ing] safety issues," handling emergencies, and so forth. Am. Compl. ¶ 60. If those allegations are true — and they must be taken as true — it is plausible that Plaintiffs perform some of their principal activities while walking.

Defendant responds that "Plaintiffs' walking to [and from] their post[s] … is exempt from the FLSA," Def.'s Mot. at 20, 23, and that Plaintiffs' vigilance "fails to establish that they were engaged in compensable work as opposed to continuing their commutes," Def.'s Reply at 12. Some cases have held that no compensation is required for time when off-duty employees need to be on call or generally vigilant. *See, e.g.*, *Akpeneye v. United States*, 990 F.3d 1373, 1383–85 (Fed. Cir. 2021). The Eleventh Circuit, moreover, has held that time police officers spend commuting in marked police vehicles is noncompensable even if they have to respond to "accidents, disabled vehicles, flagrant safety violations, or even routine traffic violations" on the way. *Llorca v. Sheriff, Collier Cty., Fla.*, 893 F.3d 1319, 1327 (11th Cir. 2018). But time on "standby status" can be compensable work, *see, e.g.*, *Akpeneye*, 990 F.3d at 1383

---

[17] Defendant may mean that compensation is only permissible for time spent donning specialized *protective* equipment, as opposed to other kinds of specialized equipment. If so, Defendant cites no authority for that proposition. In any event, it is reasonable to infer from the pleadings that Plaintiffs' "radios, handcuffs, pepper sprays, and keys" have protective functions. Am. Compl. ¶¶ 52, 57; *see Lesane v. Winter*, 866 F. Supp. 2d 1, 6–7 (D.D.C. 2011); *Martin v. City of Richmond*, 504 F. Supp. 2d 766, 774 (N.D. Cal. 2007).

(citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)), and of course compensable work can involve walking from place to place.

At this stage, Plaintiffs need only raise a plausible inference that their walks to and from the duty station are work. Questions about what Plaintiffs actually must do on their walks are fact-dependent, hard to consider in the abstract, and therefore unsuitable for resolution on the pleadings. *See Cheung v. United States*, No. 18-48C, 2021 WL 5810472, at *23 (Fed. Cl. Aug. 27, 2021) (explaining that disputes over "whether an employee is in on-call or on standby duty status are questions of fact"). It is not evident from the Amended Complaint that during their walks Plaintiffs are merely off-duty employees exercising vigilance, as opposed to *on*-duty employees who happen to be walking.

Finally, Plaintiffs allege that they should be paid for time spent completing a "briefing with the correctional officers they were relieving" when they arrive on post, Am. Compl. ¶ 61, and with the incoming duty officer when leaving, *id.* ¶ 85.[18] Defendant responds that the briefing is *de minimis* — and therefore noncompensable — because there is no feasible way to measure it consistently. Def.'s Mot. at 20–21 (pre-shift); Def.'s Mot. at 22–23 (post-shift).[19] That may be true, but at the pleadings stage, factual arguments about how long the exchange takes and the administrative difficulty of recording the time are self-defeating. Plaintiffs have plausibly alleged that obtaining information during this security briefing is integral and indispensable to their principal activities. Am. Compl. ¶¶ 61, 63–64; *Serna v. Bd. of Cty. Comm'rs of Rio Arriba Cty.*, No. CV 1:17-00196, 2018 WL 3849878, at *5 (D.N.M. Aug. 13, 2018) (holding that pre-shift security briefings for correctional officers were integral and indispensable); *Jimenez v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 697 F. App'x 597, 598–99 (10th Cir. 2017) (reversing the district court's summary judgment determination that the time spent on a pre-shift briefing for a "911 dispatcher" was not integral and indispensable). The remaining questions can await development on the merits.

---

[18] Plaintiffs allege that only one officer was paid for the security briefing "at a given time because there was not any overlap allocated for this in the schedules for the officers." Am. Compl. ¶ 61. Defendant contends that the "outgoing officer" is the one compensated. Def.'s Mot. at 23. Determining which officer is paid during these briefings is best left for development on the merits.

[19] Defendant also notes that because not all posts are staffed 24-hours each day, not all shift transfers involve both an outgoing and incoming officer. Def.'s Mot. at 21. While plausible, that argument goes to the quantification of time and damages (if any) for individual Plaintiffs, not to whether the Amended Complaint states a claim.

### D. Other Issues

In addition to challenging Plaintiffs' allegations about uncompensated time, Defendant raises three other arguments — one directed at the FLSA claims as a whole, and two at aspects of the relief Plaintiffs seek.

Defendant argues that the overall amount of time Plaintiffs spend on their pre-shift and post-shift activities is *de minimis*. Def.'s Mot. at 4, 9, 22–23; Def.'s Reply at 1–2, 12. Because Plaintiffs no longer pursue their COVID-19 pre-shift medical examination claim and their security screening claim must be dismissed, I consider whether the Amended Complaint permits a plausible inference that the remaining activities are more than *de minimis*.

OPM has provided by regulation that periods of "preparatory or concluding activity" closely related and indispensable to an employee's principal activities are *de minimis* up to "10 minutes per workday," but "shall [be] credit[ed] … as hours of work" when longer than 10 minutes. 5 C.F.R. § 551.412(a)(1). Plaintiffs' allegations about the time spent on pre- and post-shift activities add up to approximately 50 to 80 minutes each day. Am. Compl. ¶¶ 44, 53, 62, 69, 87.[20] Eliminating the time allegedly spent in security screening (10 to 20 minutes), *id.* ¶ 44, and the COVID-19 examination (10 to 15 minutes), *id.* ¶ 69, leaves approximately 30 to 45 minutes spent on allegedly uncompensated activities that survive the motion to dismiss. That means Plaintiffs have alleged those activities take more than *de minimis* time. Defendant argues that the Court "can conclude" from the pleadings that certain activities involve *de minimis* time when taken together, *see* Def.'s Mot at 21, but that turns the applicable standard upside down: This Court must draw inferences in Plaintiffs' favor, even when contrary inferences are possible. *Call Henry*, 855 F.3d at 1354.

Defendant next objects that Plaintiffs seek a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and that this Court does not have "jurisdiction to grant [such] relief." Def.'s Mot. at 25–26. Although Plaintiffs do not cite the Declaratory Judgment Act, they do request declaratory relief, which could be read as based on the Act. *See* Am. Compl. ¶¶ 137, 149. Plaintiffs present no argument in response. Defendant is correct: This Court lacks authority to issue declaratory judgments under the Declaratory Judgment Act, *see, e.g.*, *United States v. King*, 395

---

[20] The amount of time allegedly spent on pre-shift activities, when aggregated, adds up to between 40 and 65 minutes per day. Am. Compl. ¶¶ 44, 53, 62, 69. Plaintiffs also allege that they must arrive "30–45 minutes before the start of their scheduled shifts" to complete their pre-shift activities. Am. Compl. ¶ 79. The factual details are in some tension. Either way, though, when the time spent on the security screening and the COVID-19 examination is subtracted and the time spent on post-shift activities is added, Plaintiffs have alleged that their activities take more than "10 minutes per workday." *See* 5 C.F.R. § 551.412(a)(1).

U.S. 1, 5 (1969), so any claims or requests for relief Plaintiffs seek under that statute must be dismissed for lack of jurisdiction under RCFC 12(b)(1).

Defendant finally moves to dismiss Plaintiffs' claims under the Back Pay Act ("BPA"), which authorizes attorneys' fees and prejudgment interest for federal employees who are "found by appropriate authority under applicable law … to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee[.]" 5 U.S.C. § 5596(b)(1)(A), (b)(2); *see* Am. Compl. ¶¶ 114–15; Def.'s Mot. at 24–25. Given the parties' agreement that nothing distinguishes this case from *Alkire* — where I denied a motion to dismiss BPA claims, 2022 WL 575626, at *15 — I deem Defendant's present argument against the BPA claims abandoned for present purposes.[21] If the availability, nature, or measure of compensation under the BPA becomes relevant at a later stage of the case, the parties may reopen the issue.

## CONCLUSION

In summary, Defendant's Motion to Dismiss is **GRANTED** as to Plaintiffs' claims (1) related to Plaintiffs' security and health screenings, and (2) arising under the Declaratory Judgment Act. It is **DENIED** in all other respects.

In their Response, Plaintiffs request leave to amend their pleadings in the event that I grant any part of Defendant's Motion. Pls.' Resp. at 39. Because the parties have agreed that "there are no legal or factual questions" in this case that distinguish it from *Alkire*, *see* Joint Status Report, it is not clear if Plaintiffs still wish to amend. Leave to amend is therefore **DENIED** without prejudice.

The parties are **ORDERED** to submit a joint status report proposing further proceedings no later than **May 31, 2022**.


**IT IS SO ORDERED.**

        s/ Stephen S. Schwartz    
        STEPHEN S. SCHWARTZ
        Judge

---

[21] In this case, unlike in *Alkire*, Defendant argued that the BPA does not waive sovereign immunity as to prejudgment interest. Def.'s Mot. at 24. There is a circuit split on that question, *compare Brown v. Sec'y of the Army*, 918 F.2d 214, 218 (D.C. Cir. 1990); *Soc. Sec. Admin. v. FLRA*, 201 F.3d 465, 468 (D.C. Cir. 2000); *Woolf v. Bowles*, 57 F.3d 407, 410 (4th Cir. 1995); *Edwards v. Lujan*, 40 F.3d 1152, 1154 (10th Cir. 1994), *with Arneson v. Callahan*, 128 F.3d 1243, 1246 (8th Cir. 1997), and my colleagues on this Court have reached different conclusions as well, *compare, e.g.*, *Shea v. United States*, 154 Fed. Cl. 1, 5 (2021); *Astor v. United States*, 79 Fed. Cl. 303, 319 (2007), *with, e.g., Angelo v. United States*, 57 Fed. Cl. 100, 111 (2003). There is no need to join that debate now.